LANGHORNE GARDENS, INC.

v.

Caspar W. WEINBERGER, Secretary of
the United States Department of
Health, Education and Welfare

and

Blue Cross of Greater Philadelphia, Inc.

Civ. A. No. 73-2047.

United States District Court,
E. D. Pennsylvania.

March 6, 1974.

Gilbert Newman of Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for plaintiff.

Kenneth A. Ritchie, Asst. U. S. Atty., Robert E. J. Curran, U. S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION

HIGGINBOTHAM, District Judge.

▮ The fundamental question here to be resolved is whether a provider of services (Langhorne Gardens, Inc.) under the Health Insurance for the Aged Act[1] is entitled by virtue of the Fifth Amendment Due Process Clause to review of an adverse coverage determination made by the provider's fiscal intermediary[2] (Blue Cross of Greater Philadelphia, Inc). Here Blue Cross has suspended payment claimed by plaintiff for supplemental medical services rendered under "Part B" of the Act.

### I.

The Health Insurance for the Aged Act (Medicare Act), *inter alia*, establishes:

". . . a voluntary insurance program to provide medical insurance benefits . . . for aged and disabled individuals who elect to enroll under such program, to be financed from premium payments by enrollees together with contributions from funds appropriated by the Federal Government." [3]

The program is administered by the United States Department of Health, Education, and Welfare. In order to facilitate the efficient administration of supplementary medical benefits under "Part B" of the Act, the Secretary of HEW is authorized to enter into contracts delegating certain administrative responsibilities to carriers which act as fiscal intermediaries between providers of medical services and the Department. Under this contractual arrangement the carrier, *inter alia*, determines rates of payment, makes disbursements to providers of services, and audits the records of such providers in order to ascertain if proper payments are being made.[4]

The plaintiff, Langhorne Gardens, Inc., a skilled nursing facility licensed by the Commonwealth of Pennsylvania, filed an agreement with the Secretary pursuant to 42 U.S.C. § 1395cc as a provider of services under the Act. The agreement required in part that the Langhorne Gardens, Inc., not charge, except in circumstances not relevant here, any individual ". . . for items or services for which such individual is entitled to have payment made under this subchapter (or for which he would be so entitled if such provider of services had complied with the procedural and other requirements under or pursuant to this subchapter . . .) . . . ."[5] In turn Langhorne Gardens, Inc., became eligible to receive payments directly from the Federal Supplementary Medical Insurance Trust Fund[6] for services rendered pursuant to the agreement.

In February, 1971, Langhorne Gardens, Inc., began providing out-patient physical therapy services to patients eligible for benefits under the Act through a contractual arrangement[7] with registered physical therapists. As set forth in the stipulated statement of facts in the Joint Final Pretrial Order:

"6. In September, 1972, a Blue Cross review of Langhorne's claims for reimbursement indicated substantial increase in the number of claims.

"7. In December, 1972—January, 1973, Blue Cross reviewed a sample of Langhorne's past claims submitted and found that some of the claims paid during the period May to Decem-

1. 42 U.S.C. § 1395 et seq.

2. 42 U.S.C. § 1395u.

3. 42 U.S.C. § 1395j.

4. 42 U.S.C. § 1395u.

5. 42 U.S.C. § 1395cc(a)(1)(A).

6. 42 U.S.C. § 1395t(g).

7. 42 U.S.C. § 1395x(w).

ber, 1972 were subject to question on two grounds:

"a. Whether the documentation of the out-patient physical therapy treatments adequately supported a determination that the services rendered were 'medically necessary.'

"b. Whether a treatment rendered during this period of physical therapy aides, outside the presence of a registered physical therapist, was a 'covered service' under the Medicare Act.

"8. Blue Cross also found that Langhorne's arrangements with physical therapists were through written contract with American Medical Affiliates, Inc., Langhorne's parent corporation and 100% stockholder.

"9. Effective February 13, 1973, the Secretary and Blue Cross suspended payments to Langhorne for the cost of out-patient physical therapy services rendered because they suspected that Langhorne had received overpayments on claims submitted prior to February 13, 1973.

"10. By letter dated February 16, 1973, the Secretary, through Blue Cross, informed Langhorne that it was suspending all payments for the cost of out-patient physical therapy services rendered. This was the first written notice given to Langhorne that payments for physical therapy services had been or were to be suspended."[8]

The dollar amount of claims presently in dispute total approximately $153,000. Of that sum $89,041.26 represent undisputed claims presently being withheld as a recoupment or set off against the determined overpayments, and the remainder represents disputed claims submitted by Langhorne subsequent to the payment suspension of February 13, 1973. The Secretary and Blue Cross have refused to provide Langhorne a hearing, review, or appeal from the overpayment

determination and from the determination as to other claims in dispute.

Langhorne Gardens, Inc., seeks a preliminary injunction enjoining the Secretary and Blue Cross from withholding and suspending the disputed claims; it also seeks a full evidentiary hearing. The gravamen of plaintiff's complaint is that the refusal of the Secretary and Blue Cross to provide a hearing or review on the payment question has deprived Langhorne as a provider of medical services under the Act of its property without due process of law in violation of the Fifth Amendment of the United States Constitution. The question was submitted by the parties upon cross motions for summary judgment accompanied by a stipulated statement of facts. For reasons hereinafter noted, I hold that plaintiff is entitled to an administrative hearing but that plaintiff is not entitled to a decree from this Court which would require payment on the disputed claims prior to a further administrative adjudication.

II.

Administrative agencies were not expressly created by our national constitution, yet through their evolution under our constitutional form of government they continue to play a most vital role in our governmental scheme as evidenced by the rapid expansion of their powers and the pervasiveness of their authority. Mr. Justice Jackson quite accurately observed in Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 487, 72 S.Ct. 800, 810, 96 L.Ed. 1081 (1952) (Dissenting Opinion):

"The rise of administrative bodies probably has been the most significant legal trend of the last century and perhaps more values today are affected by their decisions than by those of all the courts, review of administrative decisions apart. They also have begun to have important consequences on personal rights."

8. Document No. 13, pp. 2, 3.

The governmental role of the administrative agency is a practical one. The very first Congress recognized that certain legislative schemes are of such design, scope, and purpose that the task of their administration must, as a practical matter, be carried out by governmental bodies which are neither totally legislative, executive, nor judicial in nature but in which are combined the powers and functions of all three constitutional branches of government. Thus, many of these agencies are vested with the power to prosecute, to investigate, to make and issue rules and regulations having the force of law, as well as to supervise the effectuation of legislative mandates.[9]

However, the power exercised by these bodies is necessarily circumscribed by those paramount values acknowledged in our Federal Constitution. As Chief Justice Warren stated in Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960):

> " 'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process."

Although due process boundaries may prove difficult to perceive when viewed from a perspective of theoretical generalization, the factual context of the present record reveals a case in which the administrative procedures at issue clearly fall outside of the permissible constitutional ambit.

As recent decisions of the Supreme Court make clear, the constitutional analysis in this particular context requires a balancing between the private interest affected by the government action and the governmental interest in a summary adjudication affecting that private interest. Goldberg v. Kelly, 397 U.S. 254, 263, 90 S.Ct. 1011, 1018, 25 L. Ed.2d 287 (1970); Cafeteria & Restaurant Workers Union, etc. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Hannah v. Larche, *supra.* In Goldberg v. Kelly, *supra,* the Court held that the interest of welfare recipients in maintaining their welfare benefits, which constitute for many the sole source of life's necessities, outweighed the governmental interest in protecting its fiscal and administrative resources through summary termination of those benefits. In contrast, Cafeteria & Restaurant Workers Union, etc. v. McElroy, *supra,* held the governmental interest in maintaining security at a defense establishment through summary exclusion of a civilian employed by a government subcontractor outweighed the interest of the employee in an opportunity to work on that installation where she admittedly had other immediate employment opportunities.[10] Although the instant case does not present precisely the same circumstance as either of these Supreme Court cases, there are similarities which assist the present analysis.

### III.

Neither the Medicare Act nor the rules and regulations of the Secretary promulgated thereunder grant a provider the right of appeal from fiscal intermediary determinations on questions of coverage.[11] However, this does not preclude the Court from finding that a provider is so entitled under due process standards. In Coral Gables Convalescent Home, Inc. v. Richardson, 340 F. Supp. 646 (S.D.Fla.1972), Judge Atkins held that the failure to afford a provider of services a post-determination hearing constituted a denial of due process

---

9. Davis, Administrative Law Treatise, § 1.05 (1958).

10. *See,* Cafeteria & Restaurant Workers Union, etc. v. McElroy, *supra,* 367 U.S. at 888, 81 S.Ct. at 1745.

11. 42 U.S.C. §§ 1395k, 1395y.

even though the Medicare Act did not require a hearing in the situation there at issue.

■■■ Defendants urge the Court to reach a conclusion different from that reached in the *Coral Gables* case because, they contend, the cases are distinguishable. They point out that in *Coral Gables*, the provider challenged a reasonable cost determination[12] while the instant litigation involves a determination that the medical services at issue were not covered under the Medicare Act. The thrust of defendants' contention is that since the medicare patient is obligated to pay for non-covered medical services "[p]laintiff . . . has no standing to question the Secretary as to coverage of the denied services, since the right to do so inheres in the beneficiaries involved." [13]

It is true as the defendants argue that under the Medicare Act a provider of services may look to its medicare patient for payment of non-covered services rendered by it, but it is the very question of whether the services are covered *vel non* which has created the present controversy. In effect defendants argue that plaintiff's interest in the question is *de minimis* because there is an alternative available to it under the Act—i. e., seeking payment from the medicare patient. However, the Court cannot characterize as *de minimis* the substitution of the individual medicare patients for the Federal Government as financial obligor for medical services rendered. If the services are covered services the provider is entitled *under the Act* and under its agreement to look to the government for payment. The resolution of the coverage controversy directly affects Langhorne's rights in this regard.

Langhorne has a substantial interest in perfecting its claims against the Government rather than being required to look to the individual beneficiaries of its medical services who are undoubtedly of varied financial circumstances. Those claims for which there was a determined overpayment had accrued from two to ten months prior to the February 13, 1973 suspension. It is not inconceivable that the demise,[14] unavailability, or poverty of the beneficiaries of the services represented by those claims will present substantial obstacles to the actual collection of any monies due. Additionally, Langhorne has an interest in vindicating its record as a provider of services from any inference of impropriety that might lead to the termination of its agreement by the Secretary.[15] Although it can be said that the plaintiff has a theoretical option, in view of the Blue Cross determination, its interest in proving its statutory entitlement to governmental payment under the provider agreement is far from insubstantial.

---

12. 42 U.S.C. §§ 1395f(b), 1395x(v); 20 C. F.R. 405.401–405.488. One month after the decision rendered in Coral Gables the Secretary promulgated new regulations establishing a hearing procedure for reasonable cost determinations dispute. 20 C.F.R. 405.490 et seq. (37 F.R. 10724, May 27, 1972). These regulations were severely criticized in St. Jude Manor Nursing Home, Inc. v. Richardson, Civil No. 72–681 (M.D.Fla., October 3, 1972) as ". . . not designed to afford a meaningful administrative determination of provider payment disputes." *Id.* at p. 4. Thereafter, the Act was amended to include an entirely new review mechanism for resolving provider—fiscal intermediary disputes: The Provider Reimbursement Review Board. 42 U.S.C. § 1395oo. Unfortunately, the 1972 amendments did not vest the Board with authority to review questions of coverage. See, H.Rep.No. 92–231, 92nd Cong., 2nd Sess., (1972). U.S.Code Cong. & Admin.News, p. 4989 (1972). But see, 42 U.S.C. § 1395pp(d).

13. Defendants' brief, p. 11.

14. In order to be eligible for Medicare benefits an individual must have attained the age of 65. 42 U.S.C. §§ 1395i–2, 1395o.

15. 42 U.S.C. § 1395cc states:
    "(b) An agreement with the Secretary under this section may be terminated . . .

   *     *     *     *     *

    "(2) by the Secretary . . . after the Secretary has determined (A) that such provider of services is not complying substantially with the provisions of such agreement, or with the provisions of this subchapter and regulations thereunder, . . . "

■ The defendants have not given any compelling reasons for not affording Langhorne some type of agency hearing or review or the Blue Cross determination. Of course, in expanding the jurisdictional scope of HEW's hearing procedure the overall cost of administration of the Act may increase somewhat, but this burden should be minimal since beneficiaries of medical services are afforded an opportunity to pursue their claims through administrative hearing procedures presently established.[16] The substitution of providers of services to pursue these claims in some instances cannot be seen as causing a severe dislocation within or placing a substantial fiscal or administrative burden upon the administrative agency. Therefore, I hold that plaintiff is entitled to an administrative hearing before an impartial examiner or reviewing body to resolve any questions of law or fact presently in dispute concerning Langhorne's Medicare claims.

■■ In addition to an evidentiary hearing plaintiff also seeks to enjoin defendants from withholding payment on any of the disputed claims or from withholding payment upon undisputed claims as a set off against the determined overpayments. There are no allegations set forth by plaintiff that would indicate that either this particular provider of services or that providers of services as a class under the Medicare Act will suffer the type of grievous loss envisioned by Goldberg v. Kelly, *supra*. As stated in Hilburn v. Butz, 463 F.2d 1207, 1209 (5th Cir. 1972):

> "The result in Goldberg v. Kelly was based on a judicial notice of the fact that welfare recipients as a class would be deprived of their very means of existence while awaiting the outcome of a post-termination hearing.

In turn, those recipients' necessary search for daily subsistence would adversely affect their ability to seek redress from the welfare bureaucracy. No evidence of any such dire consequences was adduced in this case."

The cases upon which plaintiff relies do not stand for the proposition that a provider of services must in all instances be afforded a hearing before payments may be withheld, or before a formal suspension of payments[17] may be implemented and in none of those cases did a court grant the type of relief requested here. If plaintiff should prevail upon the merits of its claim at the administrative hearing it will of course be entitled to government payments upon the claims to which it establishes such entitlement. However, in the absence of equitable considerations of the type envisioned by Goldberg v. Kelly, such injunctive relief as plaintiff seeks is totally inappropriate to the case at bar.

---

16. 42 U.S.C. § 1395ff(b).

17. Plaintiff also claims that Blue Cross violated HEW regulations in its implementation of the February 13, 1973 suspension. There are facts in dispute as to the exact circumstances of these violations, for not every violation of an agency regulation invalidates action taken thereunder. United States ex rel. Stone v. Robinson, 431 F.2d 548 (3d Cir. 1970). The Court does not feel this issue is material in view of the relief presently being granted since the hearing envisioned by the judgment and order in this case should cure any procedural infirmities affecting the Blue Cross determination. Hilburn v. Butz, *supra*, 463 F.2d at 1209.