WESTLAND CONVALESCENT CENTER v BLUE CROSS & BLUE
SHIELD OF MICHIGAN

ALLEN PARK CONVALESCENT HOME, INC v BLUE CROSS &
BLUE SHIELD OF MICHIGAN

REHABILITATION CENTER, INC v BLUE CROSS & BLUE SHIELD
OF MICHIGAN

NIGHTINGALE WEST, INC v BLUE CROSS & BLUE SHIELD OF
MICHIGAN

VENOY CONTINUED CARE CENTER v BLUE CROSS & BLUE
SHIELD OF MICHIGAN

Docket Nos. 64172-64178, 64286. Argued November 4, 1980 (Calendar
No. 8).—Decided September 28, 1982.

Westland Convalescent Center and several other operators of
licensed nursing homes brought actions in the Wayne Circuit
Court against Blue Cross and Blue Shield of Michigan and the
Commissioner of Insurance to challenge changes in the contrac-
tual rate of reimbursement for long-term nursing care of conva-
lescent and chronically ill patients. Temporary restraining
orders were issued preventing Blue Cross and Blue Shield from
making the changes. While these actions were pending, the
Commissioner of Insurance conducted a public hearing in the
matter of the revised reimbursement system. The commissioner
denied the requests of the nursing homes for a contested

REFERENCES FOR POINTS IN HEADNOTES
[1] 16A Am Jur 2d, Constitutional Law §§ 827, 839.
[2-4, 7-9, 11] 16A Am Jur 2d, Constitutional Law §§ 813-815.
[5, 6, 9-11, 16-23] 18 Am Jur 2d, Corporations §§ 9, 26.
  43 Am Jur 2d, Insurance §§ 11, 21.
  71 Am Jur 2d, State and Local Taxation §§ 192, 362, 363.
[6] 43 Am Jur 2d, Insurance § 22.
[9, 10] 1 Am Jur 2d, Administrative Law §§ 148, 150.
[9, 10, 13] 43 Am Jur 2d, Insurance § 30.
[11-13, 15, 17, 18] 2 Am Jur 2d, Administrative Law §§ 414-419.
[13, 14] 1 Am Jur 2d, Administrative Law § 180.
[16] 2 Am Jur 2d, Administrative Law §§ 202-204.
[20] 2 Am Jur 2d, Administrative Law §§ 553 et seq., 722, 723.
[21, 22] 2 Am Jur 2d, Administrative Law § 452.

hearing under the Administrative Procedures Act and approved the new rates. On appeal to the circuit court, the appeal and the actions already begun were consolidated. The Wayne Circuit Court, Horace W. Gilmore, J., reversed the order of the Insurance Commissioner, remanded the matter to the commissioner for a contested evidentiary hearing under the Administrative Procedures Act, and continued the injunction against the use of the revised rates of reimbursement. The Court of Appeals, Bashara, P.J., and Daner, J. (Beasley, J., concurring), reversed on the grounds that the plaintiffs were not deprived of due process by the refusal to conduct an evidentiary hearing and that the statute regulating Blue Cross and Blue Shield does not require an evidentiary hearing (Docket Nos. 78-1823—78-1830). The plaintiffs appeal.

In opinions by Justice Fitzgerald and Justice Levin, with Justice Williams dissenting, the Supreme Court *held:*

The plaintiffs are not entitled to a further hearing before the Insurance Commissioner. The case is remanded to the circuit court for further proceedings.

Justice Fitzgerald, joined by Chief Justice Coleman, wrote:

An evidentiary hearing is not required in this case, either by statute or by the Due Process Clause. The administrative hearing held under the Administrative Procedures Act comports with the procedural fairness required by due process.

1. A democratic government must practice fairness, which can rarely be obtained by secret one-sided determination of facts that are decisive of rights. Notice and the opportunity to be heard are fundamental concepts of jurisprudence. However, no rigid rule determines which interests will be protected by procedural due process because what is procedurally fair in one situation may be unfair in another. Protected property interests are not created by the mere use of special words or key phrases. The courts must assure that fair procedures are afforded before an individual person or entity is deprived of a protected interest and that arbitrary and capricious conduct by any authority will not be sanctioned.

2. The plaintiffs argue that their economic stake in the longstanding rates of payment, once the rates have been determined to be fair and reasonable, is a property interest entitling them to an evidentiary hearing before the rates can be altered. They relied on the continuation of the convalescent care program of Blue Cross and Blue Shield and became financially dependent on the continuation of the program. The plaintiffs also argue that the statute which authorizes Blue Cross and Blue Shield of Michigan to enter contracts with skilled nursing

facilities and imposes the requirement that the Insurance Commissioner authorize rates which are fair and reasonable entitles them to an evidentiary hearing, including timely notice, presentation of witnesses, evidence, and arguments, the opportunity to cross-examine any adverse witness, an impartial hearing examiner, and a written statement of findings.

3. The Insurance Commissioner possesses no inherent regulatory authority; his powers are prescribed by the Legislature. The procedures followed in this case adhered to the legislative scheme which established Blue Cross and Blue Shield of Michigan as a quasi-public, tax-exempt institution whose rates are regulated by the Insurance Commissioner, and were appropriate to the nature of the case. The procedural safeguard of the Due Process Clause protects against arbitrary deprivation of existing interests. In this case the actions of the Insurance Commissioner were not arbitrary, and the plaintiffs were afforded sufficient opportunity to assert their claimed interests before a decision was rendered.

4. Due process is a flexible concept. While it may be recognized that some kind of a hearing is due, the nature and timing of the hearing must be determined according to the relationship of the interests involved. The Legislature has not explicitly afforded an evidentiary hearing to hospitals or nursing facilities. It is the citizens of Michigan who are the primary beneficiaries of the act creating Blue Cross and Blue Shield. The governmental interest involved is the expeditious delivery of health care to the people in an effective manner. The proposed changes in the reimbursement formula would significantly reduce the amount of money received by the nursing facilities; all payments, however, would not be eliminated. Procedural fairness is required before changes are made which drastically alter essential terms of the contract between the plaintiffs and Blue Cross and Blue Shield, but in this case there has been procedural fairness.

5. In this case, the plaintiffs were given notice of the proposed action. At the public hearing they presented witnesses and submitted material in support of their position to the Insurance Commissioner. They were given the opportunity to participate in the administrative process before final action was taken. Thus they were allowed to communicate their ideas directly in a timely, efficient manner. The guarantee of procedural due process does not necessarily require an adversary proceeding. In the administrative hearing, the focus is on the presentation of pertinent information, not the demeanor of the individuals involved. Due process of law, appropriate to the

nature of the case and consistent with the statutory requirements, was afforded.

6. The Blue Cross and Blue Shield enabling legislation does not require an evidentiary hearing in this case, and it is thus not a "contested case" within the meaning of the Administrative Procedures Act. A constitutional requirement of a hearing does not mandate a full trial-like administrative proceeding where the statute does not explicitly provide for one. Only where the property interest involved is the potential deprivation of the financial means by which to live has the Supreme Court of the United States required an evidentiary hearing before the termination of benefits. Due process requires a hearing only to the extent that a party will have a chance to know and to respond to evidence against him, without requiring a hearing on the record. Administrative procedures must provide the affected party an opportunity to explain its position and rebut adverse evidence.

7. The distinct relation of Blue Cross and Blue Shield with its subscribers and the health-care facilities with which it contracts make this case one of first impression. The decision of the Insurance Commissioner to approve the rates of payment made to nursing facilities does not constitute an act of licensing under the Administrative Procedures Act, which would require that a contested hearing be held in the matter. Blue Cross and Blue Shield, in requiring nursing facilities to meet certain standards to participate, is not engaged in licensing activity when it contracts with hospitals or nursing facilities. The Insurance Commissioner does not grant a license to nursing facilities when approving rates, but acknowledges that the rates established by the contracting parties are fair and reasonable charges for health care services.

8. Administrative hearings under the Administrative Procedures Act, however informal, comport with the procedural fairness required by due process, in the absence of an explicit statutory requirement that a contested evidentiary hearing be held.

Justice Levin, joined by Justices Kavanagh and Ryan, concurring, wrote that Blue Cross and Blue Shield of Michigan is not an agency of the state for purposes of the Administrative Procedures Act and that the act does not require the Commissioner of Insurance to conduct an expanded hearing prior to approving modifications in the payment rates from Blue Cross and Blue Shield to skilled nursing facilities.

1. An instrumentality of state government is not an "agency" within the meaning of the Administrative Procedures Act

unless it is expressly created or so designated by the constitution, a statute, or agency action. Blue Cross and Blue Shield of Michigan is not, as a matter of statutory construction, a state agency within the meaning of the act.

2. The enabling legislation for Blue Cross and Blue Shield provides no substantive rights for the skilled nursing facilities which were adversely affected by the action of the commissioner in approving the revised rates of payment in the proposed contracts. A skilled nursing facility is not entitled to "fair and reasonable" rates of payment under the legislation. The commissioner determined that the revised rates were not excessive, and that determination could not adversely affect the skilled nursing facilities unless they had a substantive right to a higher rate of payment. Under the legislation, there is no need for a further hearing by the commissioner.

3. The Due Process Clause does not require that where a hearing is constitutionally required it must be conducted pursuant to the Administrative Procedures Act. The claims of the skilled nursing facilities that Blue Cross and Blue Shield is subject to the Due Process Clause, requiring an evidentiary hearing before approving the termination or modification of the provider contracts, and that the revised rates of payment are unconscionable and against public policy, justifying revision by the courts, have not been heard in the circuit court. Because the skilled nursing facilities are entitled to be heard on these issues, the cases should be remanded to the circuit court for hearing.

Affirmed.

Justice Williams, joined by Justice Moody, dissented. He wrote that the Commissioner of Insurance must support his approval of the rate of reimbursement for long-term nursing care by findings of fact, conclusions of law, and an order supported by the record. In this case, the findings of fact were not supported by the record and do not support the order; therefore, the matter should be remanded to the Commissioner of Insurance for a hearing which more adequately meets the requirements of due process and for appropriate findings of fact.

1. The rates of reimbursement must be fair and reasonable. The actions of the Commissioner of Insurance in approving the rates are subject to judicial review, and the record must support the findings of fact and conclusions of law.

2. To approve the rates the Insurance Commissioner must specifically find they are fair and reasonable. In this case, the commissioner made a finding of fact that the rates charged to

subscribers are fair and reasonable, but that the rates of payment to the contracting hospitals and nursing-care facilities are "not excessive"; that does not mean that they are fair and reasonable and may imply that they are somewhat low. None of the other findings either explicitly or implicitly finds that the rates paid to nursing-care facilities are fair and reasonable, nor is there any proper way that such a finding could be deduced from them.

3. The record indicates that the new plan was adopted by Blue Cross and Blue Shield of Michigan to reduce payments made for nursing care. However, the method chosen was one which only "most closely approximated" the aggregated costs of nursing-care facilities not connected with hospitals as estimated by Blue Cross and Blue Shield of Michigan. There is no explanation how the estimate was reached and the underlying data are not part of the record, although the plaintiffs have been permitted to see them privately. While the reduction in rates may be in the public interest, there is nothing in the record from which the Commissioner of Insurance could properly find that the proposed rates are also fair and reasonable. This conclusion is unaffected by the process for appealing in the plan, because that process relates only to extraordinary situations and has nothing to do with the establishment of the general rates.

4. The conclusion of the Insurance Commissioner that it is not improper to use different methods of reimbursement for the nursing-care facilities of hospitals and independent facilities must be justified on the record. The statement of Blue Cross and Blue Shield about the differences of Medicare payments certainly has no application to the conclusions about the rates of reimbursement. The statement about the allocation of overhead only appears to say that a given method of reimbursement for the hospitals' facilities was satisfactory. There also is an argument against the use of the "ceiling approach". However valid and useful the information, it does not support the conclusions of the Commissioner of Insurance about the fairness and reasonableness of the rate of reimbursement.

5. The issue whether due process or the Administrative Procedures Act requires a contested hearing should not be addressed at this juncture, so that the Insurance Commissioner, on remand, may devise a process for hearing the matter which will be satisfactory for both the necessities of administration and the requirements of law.

93 Mich App 357; 287 NW2d 237 (1979) affirmed.

OPINION BY FITZGERALD, J.

1. CONSTITUTIONAL LAW — DUE PROCESS — NOTICE — HEARING.

*A democratic government must practice fairness, which can rarely be obtained by secret one-sided determination of facts that are decisive of rights.*

2. CONSTITUTIONAL LAW — DUE PROCESS — HEARING.

*No rigid rule determines which interests will be protected and which unprotected by procedural due process because what is procedurally fair in one situation may be unfair in another (US Const, Am XIV; Const 1963, art 1, § 17).*

3. CONSTITUTIONAL LAW — DUE PROCESS — PROPERTY.

*Property interests protected by the requirements of procedural due process are not created by the mere use of special words or phrases, such as "rights" or "privileges" (US Const, Am XIV; Const 1963, art 1, § 17).*

4. CONSTITUTIONAL LAW — DUE PROCESS — PROPERTY.

*The courts must assure that fair procedures are afforded before an individual person or entity is deprived of a protected property interest and that arbitrary and capricious conduct by any authority will not be sanctioned (US Const, Am XIV; Const 1963, art 1, § 17).*

5. INSURANCE — HEALTH CARE SERVICES — REGULATION.

*Nonprofit health care corporation plans are created by special legislation and function as quasi-public tax-exempt institutions to assure reasonable access to, and reasonable cost and quality of, health care services (MCL 550.1101 et seq.; MSA 24.660[101] et seq.).*

6. INSURANCE — HEALTH CARE SERVICES — REGULATION.

*The Insurance Commissioner's powers to regulate nonprofit health care corporation plans are prescribed by the Legislature (MCL 550.1101 et seq.; MSA 24.660[101] et seq.).*

7. CONSTITUTIONAL LAW — DUE PROCESS — PROPERTY.

*The Due Process Clause does not create a protected interest in property but its procedural safeguard protects against arbitrary deprivation of existing interests (US Const, Am XIV; Const 1963, art 1, § 17).*

8. CONSTITUTIONAL LAW — DUE PROCESS — PROPERTY.

*Due process is a flexible concept, and courts must balance the nature of a property interest affected by governmental action against the governmental interest involved to determine the*

*nature and timing of the procedure required by due process under the circumstances (US Const, Am XIV; Const 1963, art 1, § 17).*

9. ADMINISTRATIVE LAW — HEALTH CARE SERVICES — REGULATION — CONSTITUTIONAL LAW — DUE PROCESS.

Due process of law, appropriate to the nature of the case and consistent with statutory requirements, was afforded to plaintiff nursing homes by an administrative hearing before the Insurance Commissioner, who approved changes in the rate of reimbursement for the plaintiffs' services under the nonprofit health care plan enabling act, where the Legislature has not explicitly afforded the plaintiffs an adversary evidentiary hearing, the governmental interest involved is the expeditious delivery of health care in an effective manner, the proposed changes would significantly reduce but not eliminate payments to the plaintiffs, and the plaintiffs were given notice of the proposed action and participated in the administrative hearing before the action was taken (US Const, Am XIV; Const 1963, art 1, § 17; MCL 550.1101 *et seq.;* MSA 24.660[101] *et seq.).*

10. ADMINISTRATIVE LAW — HEALTH CARE SERVICES — RATES — REGULATION — CONTESTED CASES.

The enabling statute for Blue Cross and Blue Shield of Michigan does not require an evidentiary hearing when the Insurance Commissioner approves rates which Blue Cross has contracted to pay to nursing facilities for health care services, and thus the approval proceeding is not a contested case within the meaning of the Administrative Procedures Act (MCL 24.203[3]; MSA 3.560[103][3]).

11. ADMINISTRATIVE LAW — HEALTH CARE SERVICES — REGULATION — CONSTITUTIONAL LAW — DUE PROCESS.

*Procedural fairness is required by the Due Process Clause before governmental action drastically alters essential terms of the contract between nonprofit group health care plans and hospitals and nursing homes providing health care services; however, the guarantee of procedural due process does not necessarily require an adversary proceeding (US Const, Am XIV; Const 1963, art 1, § 17; MCL 550.1101 et seq.; MSA 24.660[101] et seq.).*

12. CONSTITUTIONAL LAW — DUE PROCESS — HEARING — ADMINISTRATIVE LAW.

*Due process requires an administrative hearing to the extent, and only to the extent, that a party will have a chance to know and*

*to respond to the evidence against him, without requiring a hearing on the record (US Const, Am XIV; Const 1963, art 1, § 17).*

13. ADMINISTRATIVE LAW — HEALTH CARE SERVICES — REGULATION — HEARING.

*The decision of the Insurance Commissioner to approve the rates of payment made to nursing facilities by nonprofit group health care plans does not constitute an act of licensing under the Administrative Procedures Act, which would require that a contested hearing be held in the matter (MCL 24.201 et seq., 550.1101 et seq.; MSA 3.560[101] et seq., 24.660[101] et seq.).*

14. INSURANCE — HEALTH CARE SERVICES — REGULATION — LICENSES — ADMINISTRATIVE LAW.

*A nonprofit group health care plan is not engaged in acts of licensing of hospitals or nursing facilities when it requires them to meet certain standards in order to participate in its program.*

15. ADMINISTRATIVE LAW — HEARING — CONSTITUTIONAL LAW — DUE PROCESS.

*Administrative hearings under the Administrative Procedures Act, however informal, comport with the procedural fairness required by due process, in the absence of an explicit statutory requirement that a contested evidentiary hearing be held (MCL 24.201 et seq.; MSA 3.560[101] et seq.).*

OPINION BY LEVIN, J.

16. ADMINISTRATIVE LAW — HEALTH CARE SERVICES — STATE AGENCIES — NONPROFIT MEDICAL CARE CORPORATIONS.

*A nonprofit medical care or hospital service corporation is not a state agency within the meaning of the Administrative Procedures Act (MCL 24.203[2], 550.301 et seq., 550.501 et seq.; MSA 3.560[103][2], 24.591 et seq., 24.621 et seq.).*

17. ADMINISTRATIVE LAW — HEALTH CARE SERVICES — NONPROFIT MEDICAL CARE CORPORATIONS — MODIFICATION OF CONTRACTS — HEARING.

*The Commissioner of Insurance is not required to conduct an expanded hearing pursuant to the Administrative Procedures Act prior to approving the termination or modification of provider contracts between a nonprofit medical care or hospital service corporation and a health care provider (MCL 24.201 et seq., 550.301 et seq., 550.501 et seq.; MSA 3.560[101] et seq., 24.591 et seq., 24.621 et seq.).*

18. CONSTITUTIONAL LAW — ADMINISTRATIVE LAW — DUE PROCESS.

*The Due Process Clause does not require that any hearing constitutionally required before contracts between a nonprofit health care corporation and health care providers are modified must be conducted pursuant to the Administrative Procedures Act (MCL 24.201 et seq.; MSA 3.560[101] et seq.).*

DISSENTING OPINION BY WILLIAMS, J.

19. INSURANCE — HEALTH CARE SERVICES — NURSING-CARE FACILITIES — RATES.

*The rates of payment which Blue Cross and Blue Shield of Michigan has contracted to pay to nursing facilities for health care services must be fair and reasonable (MCL 550.1207; MSA 24.660[207]).*

20. INSURANCE — HEALTH CARE SERVICES — NURSING-CARE FACILITIES — RATES — APPEAL.

*The acts of the Insurance Commissioner in approving rates which Blue Cross and Blue Shield of Michigan has contracted to pay to nursing facilities for health care services are subject to judicial review and the record must support any findings of fact and conclusions of law (MCL 550.1207; MSA 24.660[207]).*

21. ADMINISTRATIVE LAW — INSURANCE — HEALTH CARE SERVICES — NURSING-CARE FACILITIES — RATES.

*The Insurance Commissioner, when he approves rates which Blue Cross and Blue Shield of Michigan has contracted to pay to nursing-care facilities, must specifically find that the rates are fair and reasonable; findings that the rates charged to subscribers are fair and reasonable and that the payments to the nursing-care facilities are not excessive, not improper, and will not impose severe economic burdens on the nursing-care facilities do not sufficiently support approval of the contractual rates (MCL 550.1207; MSA 24.660[207]).*

22. ADMINISTRATIVE LAW — HEALTH CARE SERVICES — NURSING-CARE FACILITIES — RATES.

*Evidence that a change in the rates which Blue Cross and Blue Shield has contracted to pay to nursing-care facilities were made to cut the cost of health care services, although that may be in the public interest, does not support a finding by the Insurance Commissioner that the rates are fair and reasonable (MCL 550.1207; MSA 24.660[207]).*

23. ADMINISTRATIVE LAW — HEALTH CARE SERVICES — NURSING-CARE FACILITIES — RATES — HEARING.

> *The Insurance Commissioner should devise a process for hearing whether to approve the rates of payment made to nursing facilities by nonprofit group health care plans which will adequately satisfy both the necessities of administration and the requirements of law (MCL 24.201 et seq., 550.1101 et seq.; MSA 3.560[101] et seq., 24.660[101] et seq.).*

*Frimet, Bellamy, Gilchrist & Jehle, P.C.,* for plaintiff Westland Convalescent Center.

*Barris, Sott, Denn & Driker* (by *Eugene Driker* and *Stephen E. Glazek)* for plaintiffs Allen Park Convalescent Home, Inc., Hendry Convalescent Center, University Convalescent & Nursing Center, Dearborn Heights Convalescent Center, Marion Manor Medical Center, Dorvin Convalescent & Nursing Center, and St. Clair Convalescent Center.

*Cook & Pringle, P.C.* (by *John A. Cook* and *Alexander J. Lelli, Jr.),* for plaintiff Rehabilitation Center, Inc.

*David Lebenbom, P.C.,* for plaintiffs Nightingale West, Inc., and Father Murray Rehabilitation Center, Inc.

*Bellanca, Beattie, DeLisle & Suchy* (by *Peter J. Bellanca* and *Gasper J. Gammicchia)* for plaintiffs Venoy Continued Care Center, Inc., Cambridge Nursing Center, Inc., Cambridge Nursing Center North, Inc., Cambridge Nursing Center East, Inc., Ke Be Corporation, Elliott General Hospital, Northwest Care Center, Inc., Qualicare, and Four Chaplains Convalescent Center, Inc.

*Foster, Swift, Collins & Coey, P.C.* (by *Theodore W. Swift, David VanderHaagen,* and *William K.*

*Fahey),* and *Michael B. Doelle* for defendant Blue Cross and Blue Shield of Michigan.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Harry G. Iwasko, Jr.,* and *Louis J. Porter,* Assistants Attorney General, for defendant Commissioner of Insurance.

FITZGERALD, J. We are asked to determine whether health care providers have the right to an evidentiary hearing either as a matter of fundamental due process or as a contested case under the Administrative Procedures Act of 1969, MCL 24.201 *et seq.;* MSA 3.560(101) *et seq.,* before the Insurance Commissioner approves a change by Blue Cross and Blue Shield of Michigan in their rates of payment.

I

Plaintiffs are skilled nursing care facilities. All are proprietary institutions rendering high-quality, frequently specialized care. They trace the origin of these specialized services to 1966 when Blue Cross and Blue Shield of Michigan (BCBSM) began a convalescent and long-term illness care program (CLTC). The program was designed to provide skilled nursing care away from the hospital to patients suffering chronic illnesses. By reducing the number of hospital beds occupied by chronically ill, terminally ill or recuperating patients, it was hoped that the program would help to reduce and contain costs of care for covered subscribers.

Participation in the CLTC program required

nursing homes to be accredited by the Joint Commission on Accreditation of Hospitals. When the program was introduced, few nursing homes met these standards; only about 7% of the nation's nursing homes were approved by the Joint Commission. Thus, to qualify for inclusion in the program, nursing homes that had previously provided merely custodial care spent considerable funds to upgrade their facilities. Capital improvements were made and equipment purchased, and skilled professional personnel were hired and trained.

The original contracts between BCBSM and the nursing facilities established a rate of reimbursement at the lesser of the provider's billed charges or one-half the average per diem benefit payment made for acute general care at a participating hospital in the same geographic area. This formula was used routinely from the inception of the CLTC program in 1966 until 1977. The contracts also provided that either party could terminate the arrangement without cause upon 15 days' notice.

In early September 1977, BCBSM mailed notices to the participating nursing facilities informing them that, at the end of the month, existing contracts would be terminated and the method of reimbursement modified. The notice stated that the changes were being made in an effort to more closely relate approved rates of payment to the providers' operating costs and, in addition, to help assure that BCBSM payments are not made when a subscriber has primary coverage under the Medicare program. The new rates were to be effective October 1, 1977. On September 30, 1977, plaintiffs were sent a rate schedule indicating that from October 1, skilled nursing facilities would be reimbursed for billed charges limited to a per diem

amount based on the 80th percentile of Medicare rates of payment on a regional basis.

It is alleged by plaintiffs that the new rates would not cover their costs and that services to BCBSM subscribers would have to be discontinued. Unable to retain skilled professionals for only private-pay patients, the nursing homes would be forced to revert to simple custodial care institutions.

Various suits were brought in circuit court and temporary restraining orders were issued preventing implementation of the new rate formula.

On November 8, the nursing homes were notified that a public hearing would be held before the Insurance Commissioner concerning the proposed rates. By subsequent letter to the Insurance Commissioner, plaintiffs objected to the informal nature of the proceeding and requested that a contested-case hearing pursuant to the Administrative Procedures Act be held. This request was denied.

The public hearing took place on November 21. One month later, the commissioner, having reviewed the testimony presented at the hearing and the memoranda filed in support of plaintiffs' positions, issued an order denying that the nursing homes had a right to a contested-case hearing and approving the proposed reimbursement formula. This decision was appealed to the Wayne Circuit Court. That court reversed the declaratory ruling and remanded the case to the Insurance Commission so that a contested-case hearing could be held. The injunctions prohibiting the implementation of the new rate structure were continued. The com-

missioner appealed this decision and order to the Court of Appeals.

The Court of Appeals reversed the lower court, holding that plaintiffs did not demonstrate the deprivation of any property interest which would entitle them to a contested-case hearing either as a matter of procedural due process or as mandated by the Administrative Procedures Act.

## II

"The heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights."[1]

Notice and the opportunity to be heard are fundamental concepts in the jurisprudence of our state and federal courts. No rigid rule determines which interests will be protected or unprotected; the conclusion to be drawn is that what is procedurally fair in one situation to protect the rights of individuals may be unfair in another.

In 1971, Justice Stewart announced that the United States Supreme Court "has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights."[2] In *Board of Regents of State Colleges v Roth,* 408 US 564; 92 S Ct 2701; 33 L Ed 2d 548 (1972), the Court held that a teacher hired for one year

[1] *Joint Anti-Fascist Refugee Committee v McGrath,* 341 US 123, 170; 71 S Ct 624; 95 L Ed 817 (1951) (Frankfurter, J., *concurring).*

[2] *Board of Regents of State Colleges v Roth,* 408 US 564, 571; 92 S Ct 2701; 33 L Ed 2d 548 (1972).

without tenure had no constitutional right to a hearing when his contract was not renewed. Looking not to the weight but to the nature of the interest asserted, the Court held that the guarantee of procedural due process attached only to secure those interests already acquired in specific benefits. The terms of Mr. Roth's appointment which served to create and define his assertedly protected interest did not support his claimed right to a hearing before termination.

In *Perry v Sindermann,* 408 US 593; 92 S Ct 2694; 33 L Ed 2d 570 (1972), a teacher, hired by a state college system under a series of one-year contracts, also faced termination due to allegations of insubordination. Sindermann's claims regarding the circumstances of his employment, the college's de facto tenure program, and his reliance thereon were sufficient to require the opportunity for him to be heard before the decision regarding his termination was made. As Professor Davis has noted, however:

"In the very case in which the Court announced that it had 'finally' rejected the distinction between rights and privileges, the Court held that the teacher lacked a 'right' to renewal of the contract.

"After 1972, the Court soon found that even though it could abolish the language of 'privilege' in its own opinions, it could not abolish the distinction between a 'right' and lack of a 'right,' and it could not draw a clean line between the two categories, because some interests clearly deserve legal protection, some interests clearly do not, many are in some degree deserving and in some degree undeserving, and decisions have to be made about interests that are not clearly 'rights' and not clearly without legal protection." 2 Davis, Administrative Law Treatise (2d ed), § 11:1, pp 342-343.

Protected property interests are not created by the mere use of special words or key phrases. Our role is to assure that fair procedures are afforded before an individual or entity is deprived of a protected interest and to reaffirm that arbitrary and capricious conduct by any authority will not be sanctioned. *Bundo v Walled Lake,* 395 Mich 679; 238 NW2d 154 (1976); *Bisco's, Inc v Liquor Control Comm,* 395 Mich 706; 238 NW2d 166 (1976).

Plaintiffs contend they are entitled to an evidentiary hearing. They argue that longstanding rates of payment, once determined to be "fair and reasonable", which materially affect the financial viability of the facility involved must not be altered without an evidentiary hearing to determine the facility's rights to participate in contracts with BCBSM. This interest in the continuation of certain rates of payment is characterized as "property" entitled to the protection of the Due Process Clause. In reliance upon their reasonable assumptions, plaintiffs allowed the BCBSM convalescent care program to take over approximately 30% to 40% of their total operation. Plaintiffs are now dependent upon the continuation of the program for their viability as skilled nursing facilities.

Plaintiffs also argue that the statutory language which authorizes BCBSM to enter into contracts with skilled nursing facilities and imposes the requirement that the Insurance Commissioner authorize rates which are fair and reasonable entitles them to an evidentiary hearing. Such a hearing would afford the guarantees of rudimentary due process, including timely notice of the action, presentation of witnesses, evidence and arguments, the opportunity to cross-examine any adverse witness, an impartial hearing examiner and a written

statement of findings. See *Bundo v Walled Lake,
supra.*

MCL 550.503; MSA 24.623 addressed BCBSM's
ability to enter into contracts with hospitals and
health care facilities.[3] In 1973, this statute was
amended to specifically authorize BCBSM to con-
tract with nursing facilities. 1973 PA 75. The
authority of the Insurance Commissioner to ap-
prove the rates charged to subscribers for hospital
services was amended to cover nursing facilities as
well. The "fair and reasonable" standard urged by
plaintiffs as the basis for an evidentiary hearing is
set forth in the section of the statute which out-
lines the commissioner's authority prior to issuing
a certificate of authority to do business and has
been interpreted by this Court as being a "stan-
dard for exercise of the commissioner's continuing
rate approval authority".[4] MCL 550.305; MSA
24.595.

We recognize the unique position held by
BCBSM. Created by special legislation, it functions
as a quasi-public, tax-exempt institution. See *Blue
Cross & Blue Shield of Michigan v Ins Comm'r,*
403 Mich 399; 270 NW2d 845 (1978). The goal of
this non-profit health care corporation has been
recently reaffirmed by the Legislature: "to assure
* * * reasonable access to, and reasonable cost
and quality of, health care services, in recognition
that the health care financing system is an essen-
tial part of the general health, safety, and welfare
of the people of this state". MCL 550.1102; MSA
24.660(102). The commissioner possesses no inher-
ent regulatory authority; his powers are prescribed

---

[3] MCL 550.501 *et seq.;* MSA 24.621 *et seq.,* was repealed by 1980 PA
350, effective April 3, 1981. MCL 550.503; MSA 24.623 may now be
found at MCL 550.1207; MSA 24.660(207).

[4] *Blue Cross & Blue Shield of Michigan v Ins Comm'r,* 403 Mich
399; 270 NW2d 845 (1978).

by the Legislature. Management of BCBSM is entrusted to the board of directors. We hold that the procedures followed here by the Commissioner of Insurance adhered to this legislative scheme and were appropriate to the nature of this case.

As noted above, while the Due Process Clause does not serve to create a protected property interest, its procedural safeguard protects against arbitrary deprivation of existing interests. We find that the actions by the commissioner were not arbitrary, and that plaintiffs were afforded sufficient opportunity to assert their claimed interests before a decision was rendered.

Plaintiffs cite many federal cases in support of their position that their economic stake in the program's continuity is a property interest entitled to procedural due process protection. See, *e.g., Case v Weinberger,* 523 F2d 602 (CA 2, 1975); *Mercy General Hospital v Weinberger,* 410 F Supp 344 (ED Mich, 1975); *Langhorne Gardens, Inc v Weinberger,* 371 F Supp 1216 (ED Pa, 1974); *Coral Gables Convalescent Home, Inc v Richardson,* 340 F Supp 646 (SD Fla, 1972). Plaintiff Allen Park Convalescent Home argues that the relationship between nursing homes and Medicare and Medicaid administrators is similar to the relationship between the nursing facilities and BCBSM inasmuch as continued participation is vital to the economic solvency of the nursing homes in both situations, and, in most cases, the nursing home has made substantial expenditures in order to qualify for reimbursement.

In *Case v Weinberger, supra,* the Court held that a pretermination hearing was not necessary before decertification of a nursing home which failed to meet statutory safety standards. While acknowledging that the expectation of continued

participation is a property interest, the Court held that the governmental interest in the safety of the patients justified the procedures employed. The Court noted:

"A nursing facility's 'need' for patients has nothing to do with the statutory benefits structure. The facility's need is incidental. That a particular nursing facility cannot survive without Medicaid participation was certainly not Congress' foremost consideration in its creation of the Medicaid program. This is not to derogate Mrs. Case's property interest in her expectation of continued participation. We must, however, place that right in proper perspective with regard to the health and safety expectations of the patients, which expectations the Secretary has a valid interest in protecting. The benefits to a nursing home from its participation in Medicaid reimbursement result from nothing more than a statutory business relationship." (Footnote omitted.) *Case v Weinberger, supra,* 607.

In *Mercy General Hospital v Weinberger, supra,* the Michigan Department of Social Services began to recoup overpayments made to the plaintiff hospital by withholding portions of current claims for reimbursement. In deciding whether the Department of Health, Education and Welfare could properly terminate Medicaid payments without providing a prior hearing, the Court used the same balancing of interests analysis and concluded that the government's position must prevail. "The reliance of the hospital on these funds, while great indeed, does not rise to the same level. It must also be remembered in this context that the Court is dealing with a corporation as opposed to a private individual."[5] In this particular situation, the Court concluded that post-termination review

[5] 410 F Supp 344, 348.

would be the most appropriate means to afford due process of law.

We do not believe that these cases mandate a contrary result. Without doubt, the proposed changes in rates of payment will have a serious impact on the operation of the nursing facilities just as the proposed actions in the cited federal cases affected the ability of the nursing homes to continue to function in the same manner. However, this is only one factor to consider in procedural due process analysis. Beginning with the premise that due process is a flexible concept, courts must balance the nature of the affected property interest against the governmental interest involved.

" '[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' *Cafeteria & Restaurant Workers Union v McElroy,* 367 US 886, 895; 81 S Ct 1743, 1748-1749; 6 L Ed 2d 1230, 1236 (1961). To say that the concept of due process is flexible does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey v Brewer,* 408 US 471, 481; 92 S Ct 2593, 2600; 33 L Ed 2d 484, 494 (1972).

Thus, while we may recognize that some kind of a hearing is due, the nature and timing of such hearing must be determined according to the relationship of the interests involved. See *Paramount Convalescent Center, Inc v Dep't of Health Care Services,* 15 Cal 3d 489; 125 Cal Rptr 265; 542 P2d 1 (1975); *Klein v Califano,* 586 F2d 250 (CA 3,

1978); *Lomond View Nursing Homes, Inc v Califano,* 639 F2d 674 (CA 10, 1981); Anno: *Termination of Medicaid Payments,* 37 ALR Fed 682; Friendly, *"Some Kind of Hearing",* 123 U Pa L Rev 1267 (1975).

The Legislature has not explicitly afforded an evidentiary hearing to hospitals or nursing facilities. The legislation creating BCBSM speaks of establishing a system which will provide quality health care at reasonable costs to all the people of the state. It is the citizens of Michigan who are the primary beneficiaries of the non-profit health care corporation act. The governmental interest involved is the expeditious delivery of such care to the people in an effective manner.

The proposed changes in the reimbursement formula would significantly reduce the amount ·of money received by the nursing facilities; all payments, however, would not be eliminated. Plaintiffs urge that their right to receipt of fair and reasonable rates is an interest protected by the guarantees of due process. We agree that procedural fairness is required before changes are made which drastically alter essential terms of the longstanding contractual relationship between plaintiffs and BCBSM. We believe, however, that this has occurred.

The critical element provided by a judicial trial or an administrative hearing is the opportunity for a party to present arguments and evidence in support of its position before a decision is rendered, the chance to respond before final action is taken. Notice and hearing are the means by which we guarantee that a party, knowing the consequences of proposed action, has a forum in which to present its position in a meaningful way.

In this instance, plaintiffs were given notice of

the action. At the public hearing they presented witnesses in their behalf and submitted material in support of their position to the Insurance Commissioner. The nursing facilities were given the opportunity to participate in the administrative process before final action was taken. This kind of presentation allows plaintiffs to directly communicate their ideas in a timely, efficient manner. The guarantee of procedural due process does not necessarily require an adversary proceeding. In the administrative hearing, the focus is on the presentation of pertinent information, not the demeanor of the individuals involved. Due process of law, appropriate to the nature of the case and consistent with the statutory requirements, was afforded.

## III

We agree with the conclusion of the Court of Appeals that in this case an evidentiary hearing is not mandated by the contested-case provision of the Administrative Procedures Act, MCL 24.203(3); MSA 3.560(103)(3). We reach this decision after evaluating the policy of the BCBSM enabling legislation in conjunction with the requirements of the APA.

"A hearing in a contested case permits an administrative agency to make a just decision on the rights, duties or privileges of named parties." Bienenfeld, Michigan Administrative Law (Ann Arbor: Institute of Continuing Legal Education), p 5-1. Once a matter is determined to be a contested case, chapter 4 of the APA governs the procedures involved and imposes requirements designed to afford the guarantees of due process of law.

The distinct nature of the administrative hearing has been addressed by this Court.

"The relationship of the courts to administrative agencies and tribunals * * * has been one marked by judicial restraint born of several considerations.

"Foremost is the separation of powers. Administrative agencies are a part of the executive branch of government. While they often act in a quasi-judicial capacity, it is recognized that they are established to perform essentially executive functions.

"An appreciation of the theory of administrative law dictates that courts move very cautiously when called upon to interfere with the assumption of jurisdiction by an administrative agency.

"There are other practical considerations. The courts have recognized the expediency of permitting the administrative process to function to the extent of its capacity before intervening at the behest of one who conceives himself aggrieved or threatened by administrative action.

"Matters consigned to administrative determination are often technical in nature, and closely related to the carrying out of some statutorily defined public policy.

"Judicial restraint tends to permit the fullest utilization of the technical fact-finding expertise of the administrative agency and permits the fullest expression of the policy of the statute, while minimizing the burden on court resources." *Judges of 74th Judicial Dist v Bay County,* 385 Mich 710, 727-728; 190 NW2d 219, 226 (1971).

The fact that there is a constitutional requirement for a hearing does not mean that a full trial-like proceeding is mandated. Indeed, the United States Supreme Court has emphasized the flexible nature of due process in administrative proceedings when the governing statute does not explicitly provide for a full hearing.[6] Only when the property

---

[6] "These decisions underscore the truism that ' "[d]ue process,"

interest involved was the potential deprivation of the financial means by which to live has the Court insisted on an evidentiary hearing prior to the termination of benefits. See *Goldberg v Kelly,* 397 US 254; 90 S Ct 1011; 25 L Ed 2d 287 (1970).

We agree with Professor Davis that "[d]ue process can be interpreted to require a hearing to the extent and only to the extent that a party will have a chance to know and to respond to the evidence against him, without requiring a hearing 'on the record' ". 2 Davis, Treatise, *supra,* p 337. See, also, Friendly, *supra;* Davis, *The Requirement of a Trial-Type Hearing,* 70 Harv L Rev 193 (1956).

A full trial-like hearing prior to the commissioner's approval of rates is not explicitly required by statute. The intent of the Legislature has been recently reaffirmed. "It is the public policy of this state that, in the interest of facilitating access to health care services at a fair and reasonable price, an alternate, expeditious, and effective procedure for the resolution of issues and the maintenance of administrative appeals relative to provider class plans be established and utilized * * * so as to minimize uncertainty and delays." MCL 550.1102; MSA 24.660(102).

---

unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' * * * More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v Eldridge,* 424 US 319, 334-335; 96 S Ct 893; 47 L Ed 2d 18 (1976).

See, also, *Morrissey v Brewer, supra; Goss v Lopez,* 419 US 565; 95 S Ct 729; 42 L Ed 2d 725 (1975); *Arnett v Kennedy,* 416 US 134; 94 S Ct 1633; 40 L Ed 2d 15 (1974); *Wolff v McDonnell,* 418 US 539; 94 S Ct 2963; 41 L Ed 2d 935 (1974); 2 Davis, Administrative Law Treatise, *supra,* §§ 10:7-10:8, pp 328-337; 4 Mezines, Stein & Gruff, Administrative Law, § 33.02, pp 33-7—33-21.

The plaintiffs' interest is alleged to be the continuation of fair and reasonable rates of payment by BCBSM; the nursing facilities contend that a trial-like hearing is required before BCBSM can materially alter a contractual provision.

Administrative procedures must provide the affected party an opportunity to explain its position and rebut adverse evidence. Arbitrary action, bias or prejudicial conduct will not be tolerated. The distinct nature of BCBSM's position with regard to the citizens it serves and the facilities with which it contracts make this case one of first impression. We do not believe, as argued by plaintiff Nightingale West, Inc., that the decision of the Insurance Commissioner to approve rates of payment made to these nursing facilities constitutes an act of licensing under the APA and, thus, requires that a contested-case hearing be held prior to a reduction in rates of payment. MCL 24.205, subds (1) and (2); MSA 3.560(105), subds (1) and (2).

"A 'license' is permission by competent authority to do an act which, without such permission, would be illegal." Bienenfeld, *supra,* p 7-1; MCL 24.205; MSA 3.560(105). Licensing involves the many procedures administrative agencies perform in conjunction with licenses.

BCBSM requires that nursing facilities meet certain standards in order to participate in the CLTC program. BCBSM's status as a quasi-public corporation may entitle it to certain benefits granted by the government, but its power is an aspect of its unique position; it has not been given governmental authority to engage in licensing activities when it contracts with hospitals or nursing facilities. Nor does the Insurance Commissioner grant a license, in the traditional sense, to nursing facilities when approving rates pursuant

to MCL 550.503. Rather, the commissioner is acknowledging that the rates established by the contracting parties are fair and reasonable charges for health care services incurred by the citizens of Michigan. Thus, while we surely continue to support the rationale underlying our decisions in *Bundo v Walled Lake, supra, Bisco's, Inc v Liquor Control Comm, supra,* and other cases which have extended the procedural guarantees of due process, our holding is necessarily confined to the facts of this case.

The Administrative Procedures Act, in the absence of an explicit statutory requirement that an evidentiary hearing be held, guarantees that administrative hearings, however informal, comport with the notions of fairness embodied in the requirements of procedural due process. This hearing has done so.

The decision of the Court of Appeals is affirmed. The matter is remanded to the circuit court for further proceedings not inconsistent with this opinion.

COLEMAN, C.J., concurred with FITZGERALD, J.

LEVIN, J. *(concurring).* This is an appeal from an order of the circuit court remanding this cause to the Commissioner of Insurance for an expanded hearing pursuant to the Administrative Procedures Act.[1] We agree with the Court of Appeals that the APA does not provide for a hearing of the claims asserted by the plaintiff skilled nursing facilities (SNFs) against Blue Cross and Blue Shield of Michigan (BCBSM) and the Commissioner of Insurance.

---

[1] MCL 24.201 *et seq.;* MSA 3.560(101) *et seq.*

## A

The SNFs claim that BCBSM is a quasi-public corporation and that the Due Process Clause requires that the SNFs be provided a hearing before the provider contracts between the SNFs and BCBSM are modified.

The Due Process Clause does not require that any hearing that may be constitutionally required be conducted pursuant to the APA. Assuming that BCBSM is subject to the Due Process Clause, it is not, as a matter of statutory construction, a state "agency" within the meaning of the APA.[2]

## B

The Commissioner of Insurance is a state "agency" but the SNFs have no substantive right under the BCBSM enabling legislation[3] which was

---

[2] MCL 24.203(2); MSA 3.560(103)(2).

[3] 1939 PA 108 and 109; MCL 550.301 *et seq.;* MSA 24.591 *et seq.,* MCL 550.501 *et seq.;* MSA 24.621 *et seq.* These enabling acts were repealed effective April 3, 1981, by the Nonprofit Health Care Corporation Reform Act, 1980 PA 350; MCL 550.1101 *et seq.;* MSA 24.660(101) *et seq.,* approved with immediate effect December 29, 1980.

The constitutionality of the Nonprofit Health Care Corporation Reform Act has been challenged, and the Ingham Circuit Court has enjoined the enforcement of that act and has directed the parties to comply with 1939 PA 108 and 109, as amended, and this Court has granted leave to appeal from those orders of the Ingham Circuit Court. *Blue Cross & Blue Shield of Michigan v Governor,* 412 Mich 944 (1982).

BCBSM moved for reconsideration of this Court's order granting leave to appeal, and this Court took that motion under advisement. *Ins Comm'r v Blue Cross & Blue Shield of Michigan* and *Blue Cross & Blue Shield of Michigan v Governor,* 412 Mich 944 (1982).

Following receipt of an executive message of the Governor, pursuant to GCR 1963, 797.1(a), requesting that this Court direct the Ingham Circuit Court to certify certain questions for immediate determination by this Court, this Court entered an order directing the Ingham Circuit Court to certify the controlling question or questions of public law. *Comm'r of Ins v Blue Cross & Blue Shield of Michigan*

adversely affected by the action of the commissioner in approving the revised rates of payment to the SNFs set forth in the modified provider contracts which BCBSM had proposed. ·

The BCBSM enabling legislation does not provide that SNFs are entitled to "fair and reasonable" rates of payment.

The determination by the Commissioner of Insurance that the revised rates of payment which BCBSM was willing to pay were not "excessive" could not adversely affect the SNFs unless they have a substantive right to a higher rate of payment.

Unless the SNFs establish that they have a substantive right to a higher rate of payment, there is no predicate for a further hearing by the commissioner to determine whether a higher rate of payment would be excessive. There is no need for a further hearing by the commissioner at this time.

## C

We would remand to the circuit court for a hearing on the claims of the SNFs that:

(i) BCBSM's purported termination of the provider contracts between the SNFs and BCBSM and the proposed new contract with revised rates of

and *Blue Cross & Blue Shield of Michigan v Governor,* 413 Mich 856 (1982).

On April 22, 1982, the Ingham Circuit Court filed its certification of the controlling questions of public law, and a statement of the need to conduct evidentiary hearings and of the factual issues relevant to the controlling questions. This Court remanded to the Ingham Circuit Court for proceedings in accordance with the proposed schedule of hearings filed by the circuit court. 413 Mich 857 (1982).

payment are unconscionable and violative of public policy justifying judicial revision of the contractual relationship between BCBSM and the SNFs; and

(ii) because BCBSM is a quasi-public corporation, the Due Process Clause requires that there be an evidentiary hearing before BCBSM terminates or revises a provider contract affecting the rights of the SNFs.[4]

I

BCBSM advised the SNFs that it would exercise a right reserved in the provider contracts between BCBSM and the SNFs which authorizes BCBSM to terminate the contractual relationship on short notice. BCBSM offered a new contract with revised rates of payment.

The SNFs commenced this action in the circuit court alleging that BCBSM had acted unconscionably and in violation of public policy and the Due Process Clause. A temporary restraining order was entered. BCBSM answered that the SNFs had failed to state a cause of action. Before there was a hearing on the question whether the temporary

---

[4] The authorities cited by the SNFs do not support the conclusion that BCBSM, as a "quasi-public institution", has become an arm of state government. In all but two of the cases cited, a state agency was directly involved in the action which was claimed to give rise to a due process violation, as in *Goldberg v Kelly,* 397 US 254; 90 S Ct 1011; 25 L Ed 2d 287 (1970), where the State of New York denied welfare benefits to certain applicants without first conducting an evidentiary hearing.

In two of the cases, *Coral Gables Convalescent Home, Inc. v Richardson,* 340 F Supp 646 (SD Fla, 1972), and *Langhorne Gardens, Inc v Weinberger,* 371 F Supp 1216 (ED Pa, 1974), the state acted, albeit indirectly through a fiscal intermediary, in suspending Medicare payments to providers of health care services.

See *Blum v Yaretsky,* — US —; 102 S Ct 2777; 73 L Ed 2d 534 (1982).

restraining order should be replaced by a preliminary injunction, the Commissioner of Insurance scheduled a hearing on the question whether the revised rates of payment should be approved under the BCBSM enabling acts. The hearing was held and the rates were approved. The commissioner also issued a declaratory ruling that the SNFs were not entitled to a contested case hearing pursuant to the APA.

The SNFs returned to the circuit court with a petition for review of the actions taken by the commissioner, who, in an amended complaint in the earlier action, was added as a defendant. After a hearing, the circuit court remanded this matter to the commissioner for an expanded administrative hearing. BCBSM acquiesced in the circuit court's decision that there should be a further hearing before the commissioner, but the commissioner appealed. The Court of Appeals reversed. We granted leave to appeal.

Although this lawsuit was commenced in 1977, there has been no hearing on the disputed factual allegations set forth in the SNFs' amended complaint. The only issues on this appeal arise out of the petition for review of the circuit court's decision requiring an expanded hearing pursuant to the APA.

II

The claim asserted by the SNFs that BCBSM is a quasi-public corporation and that the Due Process Clause requires that the SNFs be provided a hearing before BCBSM can modify the provider contracts between BCBSM and the SNFs raises both factual and legal questions. Similarly, the

parallel claim that the purported termination by
BCBSM of the provider contracts between the
SNFs and BCBSM and the new contracts and
revised rates of payment proposed by BCBSM are
unconscionable and in violation of public policy
and that, because of the relative positions of the
SNFs and BCBSM, the courts are justified in revis-
ing the contractual relationship between BCBSM
and the SNFs, raises still other factual and legal
questions.

Some aspects of the special position of BCBSM
appear from the face of the enabling legislation,
but there are other aspects which require that
evidence be presented in support and that an
opportunity be provided BCBSM to offer counter-
vailing evidence in opposition. Because the claims
of the SNFs, set forth in their original and
amended complaints, that BCBSM is subject to the
Due Process Clause and that the courts should
revise the proposed provider contracts have not
been heard in the circuit court, the SNFs are
entitled to be heard on those claims on remand.

When the facts are fully developed, the circuit
court can consider, on a fully developed record, the
legal claims that BCBSM has become an instru-
mentality of state government and is subject to the
Due Process Clause and that the courts should
revise the proposed provider contracts.

## III

The only issues in this appeal arise under the
APA: (i) is BCBSM subject to the APA, and (ii) is
the Commissioner of Insurance required to hold an
expanded hearing under the APA before approv-
ing the revised rates of payments to the SNFs?

Both questions are essentially questions of statutory construction.

## A

The APA provides:

" 'Agency' means a state department, bureau, division, section, board, commission, trustee, authority or officer, created by the constitution, statute, or agency action. It does not include an agency in the legislative or judicial branches of state government, the governor, an agency having direct governing control over an institution of higher education, or the state civil service commission." MCL 24.203(2); MSA 3.560(103)(2).

While the words of the statute might be read as including any instrumentality of state government, including what the SNFs characterize as a "quasi-public corporation", we are persuaded that the statutory definition of "agency" includes only those instrumentalities of state government expressly "created by the constitution, statute, or agency action".

The Legislature did not comprehend by the words just quoted a person or entity not designated as a state instrumentality in the constitution, or in a statute, or by agency action. There is no reason to suppose that the Legislature had in mind instrumentalities which have been declared by judicial decision, in the construction of the constitution, to be state instrumentalities and which have not been allocated by law "among and within" one of the "20 principal departments". Const 1963, art 5, § 2.

## B

The lead and dissenting opinions both assume that the "fair and reasonable" rates standard ar-

ticulated in *Blue Cross & Blue Shield of Michigan
v Ins Comm'r,* 403 Mich 399, 413; 270 NW2d 845
(1978), as the authority for the dictum regarding
"waste" applies to rates of payment to health care
providers.

The Court in *Blue Cross & Blue Shield of Michi-
gan v Ins Comm'r,* p 413, declared that it was then
holding that "[t]he Commissioner's continuing stat-
utory authority over the rates charged to subscrib-
ers by BCBSM for hospital service coverage and
the rates paid by BCBSM to hospitals for services
rendered includes the power to *disapprove a rate
increase request to the extent that wasteful expen-
ditures included in the rate base are found to be
not 'fair and reasonable',* but does not include the
power to order BCBSM to implement specific cost
containment programs. Management of BCBSM
has been entrusted to its board of directors". (Em-
phasis supplied.)

The 1978 *Blue Cross* opinion made a number of
observations *(Blue Cross & Blue Shield of Michi-
gan v Ins Comm'r,* pp 428-430), but the only hold-
ing was that the Commissioner of Insurance was
not authorized to "implement specific cost contain-
ment programs". The declaration regarding waste
was not part of the holding.

Assuming that the "fair and reasonable" rates
standard for *chartering* a health care corporation
can, as indicated in the opinion of the Court in
that case, be properly applied in deciding the scope
of the commissioner's continuing authority with
regard to rates charged subscribers and the bene-
fits to be provided to them, there is no basis in the
enabling acts for applying such a standard to rates
of payment to health care providers.[5]

---

[5] The chartering provisions do not speak of rates of *payment* to
providers but only of "the rates to be *charged*" subscribers. (Emphasis
supplied.) MCL 550.305; MSA 24.595, MCL 550.506; MSA 24.626.

In the instant case, the findings of the commissioner distinguish between the standard for rate approval with regard to subscribers and with regard to payment to health care providers. Finding No. 6 states that the proposed reimbursement system challenged by the SNFs will assure "that rates charged to subscribers are fair and reasonable, that payments to participating SNFs *are not excessive,* and that the system will not work a fraud upon the subscribers". (Emphasis supplied.)

Whatever standard is to be applied by the commissioner before approving rates charged subscribers, a "fair and reasonable" rates standard does not apply to the approval of rates of payment to health care providers. The commissioner did not err in adopting a "not excessive" standard for the purpose of deciding whether "the rates of payment of the corporation to the * * * nursing facilities"[6] shall be approved.

The SNFs are not complaining of the commissioner's finding that the revised rates of payment are not excessive (wasteful). Their complaint is rather that the rates of payment are insufficient.

The 1978 *Blue Cross* opinion did not decide that the commissioner has a power of oversight with regard to the management and design of the health care system. Even the dictum regarding the commissioner's authority to "consider" waste indicates that the powers of the commissioner are circumscribed and that he has no authority to increase a rate of payment to a health care provider: "Second, *the Commissioner only has the authority to consider waste in determining* if a rate increase is fair and reasonable. No section of the legislation indicates that the Commissioner has the additional authority to prescribe the specific

[6] MCL 550.503; MSA 24.623.

remedy which the corporation must utilize to reduce or eliminate the waste. His only powers are to approve or disapprove rates in whole or in part. The management of the corporation has been specifically entrusted to the board of directors, not to the Commisioner." *Blue Cross & Blue Shield of Michigan v Ins Comm'r*, p 429.[7] (Emphasis added.)

The SNFs are not entitled to a further hearing before the commissioner, as she has no authority under the BCBSM enabling legislation to interfere with the decision of BCBSM to substantially reduce the rates of payment to these health care providers.

The foregoing observations regarding the authority of the commissioner are based on the original BCBSM enabling acts and do not constitute an expression of opinion concerning the meaning of the Nonprofit Health Care Corporation Reform Act enacted in 1980. The constitutionality of that act has been challenged, and, during the

---

[7] The meaning of "fair and reasonable" (whether applied to "rates charged to the subscribers" or to "the rates of payment" to health care providers) is nowhere defined in this Court's 1978 opinion beyond the observation that the commissioner can disapprove rate increases on the ground that they are not fair and reasonable "to the extent that wasteful expenditures [are] included in the rate base".

In a concurring opinion, I agreed that the commissioner can disapprove rates charged subscribers which are not adequate or which would generate excessive funds; and I further expressed the view that even if one concludes that the "fair and reasonable" standard for chartering a health care corporation should be assimilated into continuing rate approval authority, "[i]n context, it appears that 'fair and reasonable' like the other four criteria there stated * * * relates to the *bona fides* and solvency of health care corporations". *Blue Cross & Blue Shield of Michigan v Ins Comm'r*, p 453, fn 11.

Assuming *arguendo* a "fair and reasonable" rates standard, such a standard does not import that the commissioner is authorized either to oversee the quality or incidence of care or to assure health care providers that they will be adequately compensated. It is our understanding of the BCBSM enabling acts that the words "fair and reasonable" concern bona fides and solvency and do not empower the commissioner to assure health care providers that they are adequately compensated.

pendency of that challenge, its enforcement has been enjoined, and the commissioner and BCBSM have been directed to comply with the original enabling acts.[8]

We would affirm the decision of the Court of Appeals reversing the decision of the circuit court and remand to the circuit court for a hearing on the allegations in respect to BCBSM set forth in the SNFs' amended complaint.

KAVANAGH and RYAN, JJ., concurred with LEVIN, J.

WILLIAMS, J. *(for remand)*. This case of first impression is of considerable importance. It examines in the vital area of delivery of health care services the evolving relationships between the Blue Cross and Blue Shield of Michigan (hereinafter BCBSM) and the providers of health care services, on the one hand; and between BCBSM and the Commissioner of Insurance, on the other hand. Since about 60% of the citizens of Michigan are subscribers to BCBSM, and since Michigan is a nationwide leader in the field of delivery of health care services, this decision can have a significantly wide impact, particularly since the issues involve how the relationship of private enterprise and government supervision can best be combined to serve the public interest of all the people. In this sense the case is of even wider interest because of the competition in the area of health care service delivery between government-supervised private enterprise and nationalized medicine.

The specific issues here involved are four: First, whether in a contract between BCBSM and a health care provider, the Insurance Commissioner

[8] See fn 3.

must approve the contract rates as "fair and reasonable" upon the basis of a hearing, findings of facts derived from the record and possibly judicial review. Second, if such a process is necessary, whether in this case the Insurance Commissioner's findings of fact and conclusions of law support his ultimate approval of the BCBSM rate payment schedules as "fair and reasonable". Third, if such a process is necessary, were the Insurance Commissioner's findings of fact and conclusions of law that the rates were fair and reasonable supported on the record? Fourth, whether health care providers have the right to an adversary evidentiary hearing either as a matter of fundamental due process or as a contested case under the Administrative Procedures Act of 1969, MCL 24.201 *et seq.;* MSA 3.560(101) *et seq.,* before the Insurance Commissioner approves a BCBSM change in their rates of payment.

We hold (1) that the Insurance Commissioner must support his approval of rates by findings of fact and conclusions of law and his ultimate order on the record, (2) that in this case the findings of fact do not support his approval, and (3) the record does not support his findings of fact. As a consequence, we are compelled to remand the matter to the Insurance Commissioner for an appropriate hearing and findings of fact. Because we find against the commissioner and must remand on issues one, two and three, we do not reach the fourth issue as to whether a contested evidentiary hearing is necessary. While we realize it would be useful to the parties to have that issue settled before remand, we consider it more important to leave that question open to see whether the Insurance Commissioner is able to devise a hearing procedure that more adequately meets the requirements of due process than the hearing under

consideration. This will permit the Insurance Commissioner to attempt to devise a procedure which will meet whatever administrative policy considerations he deems important in the public interest and that will also guarantee to the parties in this case their rightful due process or statutory process, if that is pertinent. This will permit this Court to review the critical question of what process is due after the executive branch has devoted its best attention to the problem. We retain jurisdiction.

## I. FACTS

We adopt the facts set forth in the instructive and eloquent opinion of our brother FITZGERALD.

## II. COMMISSIONER'S DUTY

We turn then to the first issue, that is, what the Commissioner of Insurance must find to approve rates and what procedures he must employ to do so. This Court in *Blue Cross & Blue Shield of Michigan v Ins Comm'r,* 403 Mich 399; 270 NW2d 845 (1978), laid down two standards which we will apply here. First, " 'the rates to be charged * * * are [to be] *fair and reasonable' ". Id.,* 428. Second, "the commissioner's actions are subject to judicial review and the record must support any findings of fact and conclusions of law". *Id.,* 430.

## III. SUFFICIENCY OF FINDINGS OF FACT

We look next to the second issue, that is, whether the commissioner's approval was supported by the findings. On what findings of fact, then, did the commissioner rely in approving the

rates in question as "fair and reasonable"? The most pertinent findings are the following:

"2. The Medicare certification and participation requirement will not impose severe economic burdens on the SNFs [skilled nursing facilities]. It will, however, account for the majority of the BCBSM cost savings which will result in a reduction of rate increases charged to subscribers in the future.

"3. The imposition of ceilings based on Medicare costs is justified in that it should more closely relate reimbursement rates to provider operating costs. The appeals process provision will allow a facility with costs in excess of the ceiling to appeal for special consideration and relief.

"4. In light of the number of currently ·participating facilities and anticipated additional participation, there will be an adequate number of SNFs available to allow reasonable access to the service benefits by BCBSM subscribers.

"5. The differing methodology for reimbursement to hospital-based and freestanding SNFs will not result in an improper rate of reimbursement, and in light of the information which is before the commissioner, this methodology appears to be reasonably suited to the differences in cost structures between the hospital-based and freestanding SNF providers.

"6. The proposed SNF reimbursement system will insure that rates charged to subscribers are fair and reasonable, that payments to participating SNFs are not excessive, and that the system will not work a fraud upon the subscribers."

The salient conclusion on examining these findings is that only number 6 comes directly to grips with the "fair and reasonable" standard. But number 6 finds:

"The proposed SNF reimbursement system will insure that rates charged to *subscribers* are fair and reasonable * * *."

However, as we noted in the earlier. *Blue Cross* case, MCL 550.503; MSA 24.623[1] reads:

"The rates charged to the subscribers for hospital service, *and* the rates of payment of the corporation to the *contracting hospitals* * * * are subject to the approval of the commissioner of insurance." (Emphasis added.)

And we spoke without distinction between subscribers and hospitals in finding that the rates are to be "fair and reasonable". 403 Mich 428. In short, the commissioner has performed his duty in finding "the rates charged to *subscribers* are fair and reasonable", but more directly in issue in this case is whether "the rates of payment * * * to the *contracting hospitals*" "are fair and reasonable".

The statute, as amended by 1973 PA 75, treating "nursing facilities" equally with "contracting hospitals", reads in pertinent part as follows:

"The rates charged to the subscribers for hospital service, and the rates of payment of the corporation to the contracting hospitals, *nursing facilities,* and home health care agencies are subject to the approval of the commissioner of insurance." MCL 550.503; MSA 24.623 (emphasis added).

With respect to whether the rates of payment to the nursing facilities were "fair and reasonable", the commissioner found *"that payments to participating SNFs are not excessive"*. Such a finding is by no means a finding that such rates "are fair and reasonable". In fact, there is a possible implication that such rates may be on the low side. In short, the commissioner has not made a specific

[1] MCL 550.501 *et seq.*; MSA 24.621 *et seq.*, was repealed by 1980 PA 350, eff. April 3, 1981. MCL 550.503; MSA 24.623 may now be found at MCL 550.1207; MSA 24.660(207).

finding with respect to his duty to find that the rates of payment to the contracting nursing facilities, meaning here the plaintiffs, or skilled nursing facilities (SNFs) "are fair and reasonable".

The other findings, numbers 2, 3, 4 and 5, do not either explicitly or implicitly find that "the rates of payment * * * to the contracting hospitals" (SNFs) "are fair and reasonable". Number 2 says, "[t]he Medicare certification and participation requirement will not impose severe economic burdens on the SNFs". Not being subject to "severe economic burdens" is perhaps better than having them imposed, but the result is certainly not necessarily equivalent to "fair and reasonable" rates. Number 3 argues in favor of the efficacy of the proposed BCBSM system but does not remotely relate to whether SNF rates are "fair and reasonable". Number 4 properly is concerned with whether there will be an adequate number of SNFs to serve BCBSM subscribers but is in no direct way concerned with whether SNFs received "fair and reasonable" rates. Number 5 observes that paying hospital-based SNFs differently will not result in *"an improper rate* of reimbursement". Obviously this finding seeks to justify the difference between the two rates rather than explicitly finding that both rates are "fair and reasonable", although this double negative finding may be the closest approach to the requisite finding. In sum, none of the findings fulfills the requirement that the commissioner find that the "rates * * * are fair and reasonable", nor is there any proper way this Court could deduce from these findings a basis for judgment.

Our conclusion that there are no proper findings that the SNFs' rates are fair and reasonable is sufficient to remand the matter to the commissioner to take such steps as are necessary to make

adequate findings of fact based on the record. However, it is appropriate that we indicate in addition whether the present record would provide a justifiable basis for making the necessary "fair and reasonable" findings.

## IV. WERE THE COMMISSIONER'S FINDINGS SUPPORTED ON THE RECORD?

The record of the administrative hearing consists of approximately 100 pages and includes a 13-page statement by a BCBSM representative and the statements of 13 SNF representatives and one independent witness. The commissioner and his staff asked a few questions during the hearing. Since the SNFs were contesting the reasonableness of the new payment plan, support for the plan must be principally found in the statement of the BCBSM representative.

Examination of the BCBSM statement indicates that the root cause of the new rate plan was a desire to cut the payments to SNFs, which had had a ceiling of 50% of hospital costs. Total SNF payments had been steadily rising over the years. As a consequence, negotiations were entered into by BCBSM and the SNFs to consider alternate reduced reimbursement plans. BCBSM recommended reimbursement related to Medicare. The SNFs opposed such a plan. The BCBSM statement continued:

"As a result of these considerations, and also in recognition of an analysis which indicated that if all participating SNF providers were certified under Medicare, BCBSM payment would be reduced by an estimated $7 million or 45 percent of the total payout for the period ending June 30th, 1976."

The Board of BCBSM thereupon adopted the new plan.

In other words, according to the BCBSM statement before the commissioner, the BCBSM board, with commendable due regard for the costs they and their subscribers would be liable for, adopted the new rate plan for SNFs. The BCBSM board, however, in adopting the new plan, made no equally pertinent statement that the new rate plan was also "fair and reasonable" to the SNFs, as the commissioner was lawfully bound to do.

*A. 80th Percentile*

The BCBSM statement, however, did not wholly disregard the impact upon the freestanding, *i.e.,* not hospital-connected, SNFs. This is specifically what that statement said:

"The 80th percentile method was eventually selected since this level of benefit payout most closely approximated the BCBSM estimate of aggregate, freestanding provider costs under CLTC [convalescent long-term care] benefit. BCBSM estimated that at the 90th percentile payout would be approximately 15 percent above estimated provider cost and use of a weighted average ceiling would produce a payout 13 percent below cost, while the 80th percentile most nearly approximated cost at 1 percent over."

The statement then added:

"BCBSM recognized that an 80th percentile ceiling would not cover all costs to all providers. However, one of the objectives was to set a payment level such that providers would be encouraged to provide services in a cost effective manner."

The statement emphasizes the need to cut costs. We cannot say this was not an appropriate pur-

pose. However, the only significant general consideration given to the SNFs' receiving an adequate, that is, a "fair and reasonable" rate from the SNFs' point of view, is the above-quoted paragraph to the effect that:

"The 80th percentile method was eventually selected since this level of benefit payout most closely approximated the BCBSM estimate of the aggregate, freestanding provider costs under CLTC benefit."[2]

At least two observations are worth noting about this statement as far as it may support a finding that such rates would be "fair and reasonable". First, the 80th percentile at 1% over costs only "most closely approximated" SNF costs. Second, the approximation is based on the "BCBSM estimate of the aggregate, freestanding provider costs under CLTC benefit".

As to the first observation, the 80th percentile is based on the most closely approximated costs, at 1% over costs. However, there is nothing here without more which permits a judgment that this is a "fair and reasonable" rate. Without more elucidation, it is not possible to conclude that receipt of a bare 1% over costs is a "fair and reasonable" rate.

As to the second observation, the basing of the 80th percentile on BCBSM's estimates, this too is a

----

[2] The BCBSM statement makes three other points relative to the technical reasonableness of tying SNF reimbursement to a Medicare base. First, the Medicare cost report utilizes the same data that SNFs would use. Second, most SNFs are Medicare-certified and fill out Medicare reports. Third, under a recent Michigan law SNFs treating Medicaid patients will soon have to become Medicare-certified. These points are less than persuasive as to 6 of the 7 plaintiffs in this case, because they do not happen to serve Medicare patients. However, the real answer to these points is that while they may support the reasonableness of the method of the ratemaking they do nothing to support the reasonableness of the level of the rate, *i.e.*, 80%, and hence they are only ancillary reasons for approval at best.

shaky ground on which to base a finding that the rate is "fair and reasonable". There is absolutely no explanation as to how that estimate was reached.[3] Furthermore, the reliability of the statement of such an estimate as a basis for judgment is called into further question, because the representative of one of the SNFs stated that

"Blue Cross Blue Shield has refused all requests from nursing home representatives for backup data that would tell how they arrived at actual dollar figures allegedly representing this 80th percentile rate."

The SNFs' witness stated their estimates ran "appreciably higher".

BCBSM in its brief denies receiving any such request, but goes on to indicate that in any event they reacted in response to a *subpoena duces tecum* "to prevent its valuable corporate information from being spread upon a public record" but later stipulated to permit plaintiffs to view the material privately. The upshot of this is that whether or not the SNFs requested and were refused this information, it never was and is not now a part of the public record to which this Court must look to see whether the commissioner's finding is justified by the record.

All in all, while the record probably suggests that BCBSM was acting in the public interest to

---

[3] For example, the BCBSM spokesman stated "we would remove from that calculation the weighted per diem costs of many of the Medicare facilities in the sample" but witness Diamond for one of the SNFs said "we have no way of knowing whether the averages used by Blue Cross Blue Shield were weighted or not weighted". While, conceivably, the commissioner might have believed one and not the other, he *does not say so*. In any event, all the commissioner had to do to know the answer to this minor point and more particularly evaluate the merits of the BCBSM estimate as a whole was to have the basis of the estimates produced by BCBSM, and, for purposes of review, spread on the record.

reduce SNF rates, there is nothing in the record on which the commissioner could properly base a finding that the proposed rate was also "fair and reasonable".

The above conclusions are not affected by the BCBSM appeal process in the new plan, because that process relates only to extraordinary situations and has nothing to do with the establishment of a general "fair and reasonable rate".[4]

## B. Comparison of Hospital-Based and Freestanding SNFs

Findings of fact and conclusions of law number 5 reads:

"The differing methodology for reimbursement to hospital-based and freestanding SNFs will not result in an improper rate of reimbursement, and in light of the information which is before the commissioner, this methodology appears to be reasonably suited to the differences in cost structures between the hospital-based and freestanding SNF providers."

It is entirely probable that this conclusion of the commissioner is a proper one. However, for purposes of review, it must be justified on the record. There are only two portions of the BCBSM statement that appear pertinent.

The first portion of the statement follows:

"The disparity between BCBSM and Medicare rates of per diem payment was less dramatic for hospital-based providers. However, there was a noticeable difference in Medicare allowable costs between hospital-based

---

[4] "Three, that an appeals process consistent with that offered other BCBSM providers be available to SNF providers to address significant and uncontrollable events which might necessitate relief from or adjustment to the ceiling, recognizing that certain facilities might provide a more intensive, but appropriate, level of care than other facilities."

and freestanding providers. To a large extent, such differences were attributable to the methods of overhead expense allocation mandated by third-party costs reimbursement policies related to acute hospital care. Because of this problem, the analysis of alternative reimbursement programs separately considered hospital-based and freestanding providers."

While this paragraph is arguably supportive of the findings of fact in the last portion of number 5, *viz.:* "this methodology appears to be reasonably suited to the differences in cost structures between the hospital-based and freestanding SNF providers", as this clause refers to cost data structures rather than cost reimbursement, it certainly has no application to the statement's earlier and for our inquiry critical observation "will not result in an improper rate of reimbursement". Consequently, this portion of the statement is not supportive of the most nearly pertinent conclusion that the "differing methodology for reimbursement * * * will not result in an improper rate of reimbursement" because it speaks not at all to rate of reimbursement.

The second pertinent portion reads as follows:

"Methods of overhead allocation, essentially mandated by already existing cost settlement mechanisms used by cost-based third parties, suggested that retrospective cost-based payment would be an administratively expedient and equitable method of reimbursement for hospital-based SNFs while still satisfying the objective of relating BCBSM payments more closely to allowable provider costs. Use of the ceiling approach for the hospital-based providers would have required that the hospital-based per diem costs be included with those of freestanding SNFs, allowing those facilities a greater spread between cost and ceiling, increasing the profits of the freestanding facilities and reducing the financial viability of the hospital-based SNFs."

Perhaps for hospital administrators this language is more meaningful than it is to the average reader. However, the first sentence only appears to say that a given method of reimbursement for hospital-based SNFs was satisfactory. The second sentence argues against "use of the ceiling approach". However valid and useful the information in this paragraph, there is no basis here for the commissioner's conclusions in number 5 that (1) "[t]he differing methodology for reimbursement to hospital-based and freestanding SNFs will not result in an improper rate of reimbursement", and (2) that "this methodology appears to be reasonably suited to the differences in cost structures between the hospital-based and freestanding SNF providers".

## Conclusion

In this challenge of a new BCBSM reimbursement formula by non-hospital-based skilled nursing facilities, which had for many years relied upon an old and more generous formula, we first reiterate this Court's decision that the Commissioner of Insurance must in determining approval find reimbursement rates "fair and reasonable" and that he must do so after a hearing in which a record must be established that will support pertinent findings of fact and conclusions of law. Second, we find that the approval by the Commissioner of Insurance of reimbursement rates in the present case was based on inadequate findings of fact and conclusions of law which, third, in any event were not justified by the record. As a consequence, we are compelled to remand the matter to the commissioner for proper findings on a proper record. Fourth, we do not at this juncture address the tremendously important problem whether due

process or the Administrative Procedures Act requires a contested hearing. We do this to allow the commissioner to attempt to devise a hearing process which will be satisfactory both to the administrative necessities and to the requirements of law. We retain jurisdiction.

BLAIR MOODY, JR., J., concurred with WILLIAMS, J.