# STATE OF MICHIGAN

# COURT OF APPEALS

DETROIT WATER AND SEWERAGE
DEPARTMENT and GREAT LAKES WATER
AUTHORITY,

        Respondents-Cross-Appellants,

v

AFSCME COUNCIL 25 AND ITS AFFILIATED
LOCALS 207 AND 2920,

        Petitioner-Appellee-Cross-
        Appellee,

and

INTERNATIONAL UNION OF OPERATING
ENGINEERS LOCAL 324,

        Intervenor-Appellant.

UNPUBLISHED
November 21, 2017

No. 332156
MERC
LC No. 15-000024

Before: O'CONNELL, P.J., and MURPHY and K. F. KELLY, JJ.

PER CURIAM.

Intervenor, International Union of Operating Engineers Local 324 (IUOE), appeals as of right an order entered by the Michigan Employment Relations Commission (MERC), granting a petition for unit clarification brought by petitioner, AFSCME Council 25 and its Affiliated Locals 207 and 2920 (AFSCME). MERC determined that AFSCME's bargaining unit, not IUOE's bargaining unit, would represent two new job classifications, Plant Technician (PT) and Office Support Specialist (OSS), formed at Detroit Water and Sewerage Department (DWSD) and Great Lakes Water Authority (GLWA). Respondents, DWSD and GLWA, cross-appeal the same order. We vacate the first footnote of MERC's opinion but affirm in all other respects.

## I. BACKGROUND

In 1977, the United States Environmental Protection Agency brought an action in the Federal District Court for the Eastern District of Michigan against the City of Detroit (the City) and DWSD, alleging violations of the Clean Water Act, 33 USC 1251 *et seq*. For more than

-1-

three decades, DWSD repeatedly tried, but failed, to comply with its National Pollutant Discharge Elimination System permit.

In 2011, the federal district court established a committee to investigate the root causes of the City and DWSD's inability to comply with the permit. Relying on the committee's recommendations, the federal district court entered an order in November 2011 setting forth steps for DWSD to take to achieve compliance. Pertinent to this appeal, the federal district court ordered the director of DWSD to "perform a review of the current employee classifications at the DWSD and reduce the number of DWSD employee classifications to increase workforce flexibility."

In 2013, DWSD began reorganizing its work force. DWSD eliminated all 257 of its job classification titles and replaced them with 57 new job classifications. In doing so, DWSD removed some job classifications from certain bargaining units and placed the new classifications into different bargaining units. Pertinent to this appeal, AFSCME pursued a unit clarification (UC) petition and an unfair labor practice (ULP) petition with MERC, challenging DWSD's assignment of the PT and OSS job classifications to IUOE representation and alleging that many of these employees were formerly in units represented by AFSCME.

Meanwhile, in September 2014, during the City's bankruptcy proceedings, the City of Detroit, Macomb County, Oakland County, Wayne County, and the State of Michigan agreed to establish the GLWA, to begin operating no later than January 1, 2016. The purpose of the GLWA was to operate "all regional water and sewer systems" through a lease with the City, while the City maintained only "the local water and sewer infrastructure in Detroit."

At the MERC hearing on AFSCME's petition, Terri Connerway, Organizational Development Director for GLWA, testified that DWSD created a transition team to oversee the reorganization process. Responding to concerns about a lack of flexibility in job responsibilities, a lack of employee training, and the inefficient utilization of employees and technology, the transition team formed five design teams to assess the organization of five different areas of the plant. The design teams proposed new job classifications after determining what tasks and responsibilities should be grouped together. The design teams identified "feeder classifications[,]" i.e., old job classifications, to map into new job classifications.

## A. CREATION OF THE PT JOB CLASSIFICATION

One design team proposed the PT job classification, composed of 11 feeder classifications and 125 employees. Of those 125 employees, five were in a supervisory position represented by the UAW, six were Boiler Operators/Plant Equipment Operations Mechanics (PEOM) represented by IUOE, and the remaining 114 employees were in job titles represented by AFSCME.

The PT position's basic job function was to operate various types of plant equipment and monitor plant-wide operations. The PT position had four different job levels, and employees could advance to different levels depending on skills, training, and experience. PT Level 1 did not require a special certificate. PT Level 2 required a Municipal Wastewater Treatment Plant Operator D Certification. PT Level 3 required a Municipal Wastewater Treatment Plant

Operator C Certificate. PT Level 4 required additional licenses, certifications, and training. The higher level PT employees had a higher salary, but they all had the same benefits package.

Several employees testified that their job responsibilities had not changed since the creation of the PT position. The PT job was similar to the Water Technician job, which AFSCME represented.

## B. CREATION OF THE OSS POSITION

Another design team recommended creation of the OSS position, which merged the duties of 17 feeder titles and covered 39 employees. Of those 39 employees, one was a head clerk, which was a non-union position. Fourteen employees were in feeder titles of Principal Clerks and Office Management Assistants represented by IUOE Local 324. The remaining 25 employees held titles represented by AFSCME.

The OSS job description included office work and other clerical functions. The OSS position had three levels. OSS Level 1 required a high school diploma, a driver's license, and one year of office or administrative support experience. In addition to the Level 1 requirements, Level 2 required a minimum of three years of relevant experience. Finally, in addition to the Level 2 requirements, Level 3 required an associate's degree or four years of relevant experience.

Several OSS employees testified that the OSS job position was similar to their former positions. One OSS employee testified that Customer Service Specialists (CSS), who were mapped into AFSCME, often communicated and worked with OSS employees.

## C. UNION ASSIGNMENT PROCESS

In March 2014, DWSD informed the unions of the new classifications and unit assignments. DWSD assigned the PT and OSS job classifications to IUOE Local 324. To AFSCME, it assigned several new classifications, including Fleet Technicians, Water Technicians, System Technicians, Maintenance Technicians, Security Guards, Customer Service Specialists, and some levels of Field Service Technicians.

Connerway testified that she and the transition team considered 18 community of interest factors to determine union representation of the new job classifications. The discussion of those factors, provided by legal counsel, was considered privileged. However, Connerway testified that the factors favored placement of the PT position with IUOE. The transition team considered the highest level of expertise of the union-represented feeder classifications, which belonged to the Boiler Operator/PEOM position represented by IUOE Local 324. Thus, the team assigned the PT position to IUOE, even though only six of the 125 PT employees were Boiler Operator/PEOMs.

Connerway also agreed that AFSCME represented the "vast majority" of the feeder classification employees (more than 100 employees) before the creation of the PT classification, including many of the Maintenance Technicians and the Electronics and Instrument Control Technicians. Before the PT job classification, IUOE represented about 50 employees, including the Boiler Operators, the Principal Clerks, and other clerical workers.

Regarding the OSS classification, Connerway testified that a primary reason for assigning OSS positions to IUOE was the fact that the highest skilled union-represented feeder classification was Principal Clerk, represented by IUOE Local 324. The transition team compared feeder classifications, work schedules, and compensation to determine the highest experience, responsibility, and training level, which factored into the union assignment decision. IUOE's ability to provide training was also a likely factor in placing OSS jobs in the IUOE bargaining unit. Connerway agreed that IUOE did not represent any clerical workers apart from OSS workers.

Connerway explained that the transition team considered IUOE's ability to provide training. One of the mandates in the federal district court's November 2011 order required DWSD to create an internal training and apprenticeship program. No other unions offered the training that IUOE proposed to offer, but Connerway did not recall asking AFSCME if it could provide the same training.

Connerway testified that all of the work rules, insurance, and benefits packages were the same for all of the bargaining units. Connerway agreed that IUOE had a collective bargaining agreement in place and that AFSCME did not, but she testified that this difference did not impact the union assignment decision. Similarly, the fact that about 35 AFSCME Local 207 members walked off the job in 2012 did not impact the union assignment decision, nor did AFSCME's refusal to drop its challenge to the federal district court's November 2011 order.

D. TRAINING AND LICENSING REQUIREMENTS FOR PT AND OSS EMPLOYEES

David McNeeley, the Chief Operating Officer of Wastewater Operations, testified about DWSD and GLWA's training goals. The intent was to train all employees in the skills necessary for their jobs first, then to cross-train employees in other areas in their classifications and potentially in other job classifications. With respect to the PTs, DWSD and GLWA intended to rotate the PTs into each of the five process areas of the wastewater plant and to increase the PTs' training in the job responsibilities of Maintenance Technician to decrease reliance on maintenance technicians. Long-term goals included training PTs in chemistry.

With respect to OSS employees, the OSS position did not have specialized state licensure requirements to advance to different OSS job levels. OSS employees would rotate into different assignments for cross-training. DWSD and GLWA proposed training on office software applications. However, clerical workers previously attended similar training when they were in their former job classifications.

E. MERC OPINION AND ORDER

Following the hearing and post-hearing briefing, MERC entered an opinion and order granting AFSCME's unit clarification petition and ruling that AFSCME would represent the PT and OSS positions. First, MERC determined that the PT and OSS positions were new positions because of the federal district court's order to restructure, even though many of the job duties did not change. Next, MERC determined that the grouped employees shared a community of interest with other classifications represented by AFSCME. MERC ruled that it would not defer to DWSD's decision to place the PT and OSS positions in IUOE Local 324 because DWSD

failed to demonstrate that its decision was reasonable. MERC held that its primary objective was to create "the largest unit" incorporating "all common interests" when assigning bargaining units. Thus, MERC added the PT and OSS positions to the larger unit of positions also represented by AFSCME.

## II. STANDARD OF REVIEW

When reviewing a MERC decision,

> the MERC's factual findings are conclusive if supported by competent, material, and substantial evidence on the whole record. Legal questions, which include questions of statutory interpretation and questions of contract interpretation, are reviewed de novo. As a result, an administrative agency's legal rulings are set aside if they are in violation of the constitution or a statute, or affected by a substantial and material error of law. [*Macomb Co v AFSCME Council 25*, 494 Mich 65, 77; 833 NW2d 225 (2013) (quotation marks and citations omitted)].

We review de novo constitutional and jurisdictional issues, which involve questions of law. *Bank v Mich Ed Ass'n-NEA*, 315 Mich App 496, 499; 892 NW2d 1 (2016); *In re Parole of Hill*, 298 Mich App 404, 410; 827 NW2d 407 (2012).

## III. ANALYSIS

### A. ASSIGNMENT OF NEW POSITIONS TO AFSCME

#### 1. GOVERNING LAW

The public employment relations act (PERA), MCL 423.201 *et seq.*, "governs public sector labor law, and its provisions have been held to take precedence over other conflicting laws to ensure uniformity, consistency, and predictability in the critically important and complex field of public sector labor law." *Kent Co Deputy Sheriffs' Ass'n v Kent Co Sheriff*, 238 Mich App 310, 313; 605 NW2d 363 (1999). MERC is charged with interpretation and enforcement of PERA, and MERC has jurisdiction to address and resolve allegations of unfair labor practices. *Id*. at 313-314.

MERC has the authority "to determine appropriate units for collective bargaining." *AFSCME Council 25 v Faust Pub Library*, 311 Mich App 449, 460; 875 NW2d 254 (2015). Section 13 of PERA provides in part:

> The commission shall decide in each case, to insure public employees the full benefit of their right to self-organization, to collective bargaining and otherwise to effectuate the policies of this act, the unit appropriate for the purposes of collective bargaining as provided in [MCL 423.9e.] [MCL 423.213.]

In turn, MCL 423.9e states in full:

> The commission, after consultation with the parties, shall determine such a bargaining unit as will best secure to the employees their right of collective

bargaining. The unit shall be either the employees of 1 employer employed in 1 plant or business enterprise within this state, not holding executive or supervisory positions, or a craft unit, or a plant unit, or a subdivision of any of the foregoing units. If the group of employees involved in the dispute was recognized by the employer or identified by certification, contract, or past practice, as a unit for collective bargaining, the commission may adopt that unit.

In construing PERA and designating an appropriate bargaining unit, MERC "may reexamine its prior decisions and depart from precedents." *Melvindale-Northern Allen Park Federation of Teachers v Melvindale-Northern Allen Park Pub Schools (After Remand)*, 216 Mich App 31, 37; 549 NW2d 6 (1996). "If the departure from precedent is explained, appellate review is limited to whether the rationale is so unreasonable as to be arbitrary and capricious." *Id*. at 38.

## 2. APPLICATION

IUOE, DWSD, and GLWA argue that MERC erred by assigning the PT and OSS positions to AFSCME's bargaining unit. We review MERC's conclusions that (1) the PT and OSS positions were "newly created," (2) the PT and OSS positions shared a community of interest with the competing bargaining units, and (3) DWSD's decision to place those positions in IUOE Local 324 was unreasonable.

### a. NEWLY ESTABLISHED POSITIONS

In finding that the PT and OSS positions were "new positions[,]" MERC acknowledged that it departed from its "normal definition of that term." Initially, MERC found that the PT and OSS positions did not meet the definition of a "new" positon because the job duties did not substantially change, even though some employees assumed more responsibilities and the employer planned to cross-train the PT and OSS employees. However, MERC treated the PT and OSS classifications as "newly created" positions because of the federal district court's mandate that DWSD restructure its work force. This decision was not arbitrary and capricious.

Although some employees testified that their day-to-day responsibilities had not changed, the federal district court ordered a substantial overhaul of DWSD operations and mandated that DWSD streamline its operations after years of failing to comply with the Clean Water Act. To effectuate this mandate, DWSD undertook a comprehensive review of its operations. Design teams studied the different processes of the operation and made recommendations for the two new positions based on their observations. Thus, the context in which the positions were created support MERC's finding that they were "newly created."

The features of the positions also support the conclusion that they should be treated as new positions. Both positions combined the job functions of multiple former classifications. The new positions eliminated some supervisory positions and replaced them with job levels. The PT position had job levels that required employees to gain certain licenses. Unlike the former classifications, these new levels allowed employees to advance without having to wait for an open position. In addition, DWSD and GLWA placed a much greater emphasis on training with the new classifications. In sum, given the context of the creation of these positions, and

considering the changes incorporated into the PT and OSS positions, MERC's finding that the positions were "newly created" was supported by competent, material, and substantial evidence, and its conclusion was not arbitrary and capricious or legally erroneous.

## b. COMMUNITY OF INTEREST

Next, MERC did not err by concluding that the PT and OSS positions had a community of interest with the competing bargaining units. To determine an appropriate collective bargaining unit, MERC must decide which individuals are "employees" and what group of employees "shares a community of interests" to maximize "representation by a single bargaining agent . . . ." *Taylor Federation of Teachers v Taylor Bd of Ed*, 167 Mich App 474, 476-477; 423 NW2d 44 (1988). "A community of interests includes, among other considerations, similarities in duties, skills, working conditions, job classifications, employee benefits, and the amount of interchange or transfer of employees." *Police Officers Ass'n of Mich v City of Grosse Pointe Farms*, 197 Mich App 730, 736; 496 NW2d 794 (1993).

MERC's factual findings with respect to the community of interests are supported by competent, material, and substantial evidence on the whole record. MERC acknowledged that the PT and OSS positions shared a community of interests with IUOE, but it also found that the PT and OSS positions shared a community of interest with AFSCME positions. Summarizing the community of interests with existing AFSCME positions, MERC found that the employees report to the same supervisors, "share the same locker rooms, parking lots, and break room facilities, punch the same time clock, and report to the same upper level management team." MERC further noted that they "are subject to the same work rules" and work mostly overlapping shifts. MERC remarked that they all require a high school diploma or GED, except for one position that required an associate's degree.

With respect to the PT position, evidence showed that PTs shared a community of interest with other employees represented by AFSCME. Specifically, evidence showed that PTs had similar duties and responsibilities as Water Technicians, Maintenance Technicians, System Technicians, and Special Project Technicians, all represented by AFSCME. PTs worked with Maintenance Technicians, shared the same showers, locker rooms, and cafeteria, and attended meetings together. Some employees reported to the same management team. In addition, the employees shared the same benefits package and were subject to the same work rules. Employees in these positions, like the PT employees, were to be cross-trained and provided access to additional training courses.

Similarly, with respect to the OSS title, evidence showed that the OSS title shared many similarities with the CSS employees who were represented by AFSCME. OSS employees had similar job duties and responsibilities, and both positions had similar job qualifications and training requirements. Employees in both classifications used the same or similar software programs. Evidence also showed that CSS and OSS employees communicated and worked together on a daily basis. Both classifications shared the same work rules and had the same benefits package.

We conclude that MERC's factual findings regarding the community of interests are supported by substantial, material, and competent evidence on the whole record.

## c. REASONABLENESS

Finally, MERC concluded that DWSD failed to demonstrate that its decision to assign the PT and OSS positions to IUOE was reasonable. MERC found that DWSD did not consider traditional factors for analyzing the community of interest and that DWSD erred by focusing on the highest skill level of the feeder classifications and the training program offered by IUOE. MERC noted that DWSD did not articulate how assigning the new positions to IUOE on the basis of the highest skill level of the feeder classifications benefited the employer and the employees.

MERC's finding that DWSD failed to articulate that its decision was reasonable is supported by competent, material, and substantial evidence on the whole record. Connerway testified that the transition team considered several community of interest factors in making its assignment decision, but she failed to articulate which factors in particular showed that the job classifications had a community of interest with IUOE Local 324. Connerway repeatedly stated that the team focused on which feeder classification had the "highest skilled" employees in assigning the new positions to a bargaining unit. However, she did not articulate how this factor showed a community of interest with IUOE Local 324 or favored placing the employees into Local 324 over AFSCME.

In addition, Connerway noted consideration of IUOE Local 324's training program. In 2012, DWSD agreed to pay $.40 cents an hour per employee into an employee training fund. The training fund would allow IUOE members to take up to four free training courses per year, while non-IUOE members would pay $1,580 for these four courses. IUOE Local 324 worked with DWSD to provide on-site training beginning in January 2015. By contrast, AFSCME did not have a structured training program like IUOE.

Nonetheless, Connerway did not articulate how training and the highest skilled feeder classification were beneficial to the employees or to DWSD or why these factors showed a community of interest with IUOE Local 324. Similarly, evidence showed that DWSD employees had access to Local 324's training program irrespective of union assignment. Thus, merely indicating consideration of highest skill and training programs was not sufficient to show that the assignment was reasonable.

IUOE, DWSD, and GLWA argue that MERC improperly departed from precedent, holding that MERC should defer to the employer's unit assignment decision absent a finding of bad faith. They contend that MERC erred by weighing the "degree of interest" between the employees and the competing bargaining units. To the extent that MERC departed from precedent by not deferring to DWSD's assignment decision, it is permitted to do so if its rationale is not arbitrary and capricious. See *Melvindale-Northern Allen Park Federation of Teachers*, 216 Mich App at 38. Even assuming that MERC departed from its own precedent in this case, MERC articulated a reasonable rationale behind its decision. This Court has explained MERC's goal in defining a bargaining unit:

> In designating appropriate bargaining units, [MERC's] primary objective is to constitute the largest unit which, under the circumstances of the case, is most compatible with the effectuation of the purposes of the law and includes in a

single unit all common interests. Consistent with this objective, [MERC's] policy is to avoid fractionalization or multiplicity of bargaining units. The touchstone of an appropriate bargaining unit is a common interest of all its members in the terms and conditions of their employment that warrants inclusion in a single bargaining unit and the choosing of a bargaining agent. This Court abides by [MERC's] policy to constitute the largest bargaining unit compatible with the effectuation of the PERA. [*Faust Pub Library*, 311 Mich App at 460 (quotation marks and citation omitted; alterations in original).]

Likewise, in this case, MERC stated its policy of avoiding unnecessarily breaking up a bargaining unit and found no reason to favor smaller units over a larger unit. Having concluded that the positions are new, MERC noted the absence of bargaining history or an agreement. Thus, MERC added the new positions to the largest unit of employees within DWSD and GLWA that shared a community of interest with the larger unit of other employees represented by AFSCME. MERC then reasonably concluded that this single bargaining unit would better serve the employees and the employer and better effectuate the purpose of PERA. Thus, this reasoning is rational, and MERC was not bound to defer to DWSD, to find bad faith, or to follow past precedent. IUOE, DWSD, and GLWA have not shown that MERC's decision amounts to an error of law or that its decision to depart from precedent was arbitrary and capricious.

IUOE and DWSD/GLWA argue that MERC erred by relying on *Hotel Olds v State Labor Mediation Bd*, 333 Mich 382; 53 NW2d 302 (1952), to create the "largest" possible bargaining unit when deciding a UC petition. This argument lacks merit.

In *Hotel Olds*, 333 Mich at 387, our Supreme Court announced the policy of favoring the largest possible unit that effectuates PERA and unites common interests. This Court has continued to follow this policy. See *Faust Pub Library*, 311 Mich App at 460. Therefore, MERC did not err by relying on *Hotel Olds* as supporting the creation of a larger unit, nor did this reliance mark an unreasonable departure from precedent.

In sum, MERC's factual findings are supported by competent, material, and substantial evidence on the whole record. In addition, MERC's legal rulings did not violate the constitution or any statute, and they are not affected by a substantial and material error of law. Accordingly, MERC did not err by granting AFSCME's UC petition.

## B. FOOTNOTE REGARDING MULTI-PARTY BARGAINING

DWSD and GLWA argue that MERC erred by ordering multi-employer bargaining in a footnote. DWSD and GLWA argue that none of the parties raised the issue of a "multi-employer bargaining unit," and no evidence showed DWSD and GLWA's agreement to form a "multi-employer bargaining unit." Because the parties did not expressly consent to a multi-party bargaining unit and because none of the parties requested such a ruling, we vacate this footnote.

## C. ADDITION OF GLWA TO THE PROCEEDING

DWSD and GLWA argue that the administrative law judge (ALJ) deprived GLWA of procedural due process by adding GLWA to the MERC proceeding on the fifth day of the hearing. We reject this claim of error.

First, we note that GLWA waived any objection to being bound by the MERC's order in this case. In a letter and in statements made to the ALJ before the hearing, William Wolfson, who represented DWSD at the conference and who was General Counsel for GLWA, stated that GLWA had no evidence to offer and agreed that GLWA would be bound by the MERC's ruling in this case. Only on the fifth day of the hearing, when AFSCME filed an amended UC petition to add GLWA to the proceeding, did GLWA object. "A party may not harbor error as an appellate parachute by assenting to action in the lower proceeding and raising the issue as an error on appeal." *Wilcoxon v City of Detroit Election Comm*, 301 Mich App 619, 640 n 8; 838 NW2d 183 (2013). Thus, GLWA cannot argue on appeal that it should not be bound by MERC's order when it agreed to be bound by the order in the administrative proceedings below.

Even if we were to consider this issue, we would conclude that GLWA was not denied procedural due process. An administrative proceeding must comport with due process. *Westland Convalescent Ctr v Blue Cross & Blue Shield of Mich*, 414 Mich 247, 273; 324 NW2d 851 (1982). "[P]rocedural due process requires that a party be provided notice of the nature of the proceedings and an opportunity to be heard by an impartial decision maker at a meaningful time and in a meaningful manner." *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 213-214; 761 NW2d 293 (2008).

In this case, GLWA had notice of the proceedings and an opportunity to be heard. The ALJ put GLWA on notice at the pretrial conference that the ALJ believed GLWA should be a party to the proceeding. On the first day of the hearing, before the first witness was called, the ALJ again stated that GLWA should be added as a party to the proceeding. Nonetheless, Wolfson attended the pretrial conference and the eleven-day hearing without participating in the hearing. Moreover, GLWA and DWSD were the same entity until GLWA commenced operation on January 1, 2016, and Wolfson served as counsel to both GLWA and DWSD. Thus, GLWA was not denied procedural due process.

## D. EMERGENCY MANAGER'S AUTHORITY AND MERC'S JURISDICTION

DWSD and GLWA argue that MERC did not have jurisdiction to review and change DWSD's bargaining unit assignment because the City of Detroit's Emergency Manager approved creation of the PT and OSS job classifications. We disagree.

The Legislature enacted the Local Financial Stability and Choice Act, MCL 141.1541 *et seq*. (the Emergency Manager Law), to address the ramifications of a local government experiencing a financial emergency. MCL 141.1543. When DWSD reclassified all of its jobs, the City of Detroit was under the management of Emergency Manager Kevyn Orr. In December 2013, Orr authorized revision of the classification scheme and approved the reclassified jobs.

DWSD and GLWA cite MCL 141.1549(2), MCL 141.1551(1), and portions of MCL 141.1552(1) to argue that the Emergency Manager's sweeping power deprived MERC of jurisdiction to decide this case. MCL 141.1549(2) grants the Emergency Manager authority to act in lieu of public officials. MCL 141.1551(1) directs the Emergency Manager to develop "a written financial and operating plan for the local government." Similarly, although MCL 141.1552(k) and (*l*) delegate certain powers with respect to collective bargaining, this case does not involve collective bargaining. Rather, it concerns a unit clarification petition, which is

-10-

within MERC's exclusive jurisdiction to resolve, and nothing in MCL 141.1552 revokes that power. None of these provisions usurps, conflicts with, or supersedes MERC's jurisdiction to address and resolve issues arising under PERA, including unit clarification petitions. In sum, MERC had the authority to address and resolve the UC petition arising under PERA, and the presence of the Emergency Manager did not strip MERC of that jurisdiction.

## IV. CONCLUSION

MERC's findings of fact are supported by competent, material, and substantial evidence on the whole record, and its legal ruling did not violate the constitution or a statute and was not affected by a substantial and material error of law. In addition, MERC did not err in adding GLWA to the proceeding, and the presence of the Emergency Manager did not deprive MERC of its jurisdiction. However, MERC erred by including the first footnote in its decision because no evidence supported a multi-employer bargaining unit and no party requested such a ruling. Thus, we vacate the first footnote of the MERC's opinion, but affirm the MERC's decision in all other respects.

Affirmed in part and vacated in part.

/s/ Peter D. O'Connell
/s/ William B. Murphy
/s/ Kirsten Frank Kelly

-11-